OPINION
{¶ 1} Defendant-Appellant, Terrance Wilson, appeals the judgment of the Union County Court of Common Pleas, convicting him of failure to comply with an order or signal of a police officer. On appeal, Wilson argues that the trial court erred when it permitted a defense witness to assert his Fifth Amendment privilege after making statements that implicated him of other criminal activity; that the trial court erred when it overruled Plaintiff-Appellee's, the State of Ohio's, objections to certain jury instructions and the verdict form; and, that he was denied the right to effective assistance of counsel. Based on the following, we affirm the judgment of the trial court.
 {¶ 2} In September of 2005, the Union County Grand Jury indicted Wilson for one count of failure to comply with an order or signal of a police officer in violation of R.C. 2921.331(B), (C)(5)(ii), a felony of the third degree.
 {¶ 3} In November of 2005, Wilson was arraigned and entered a plea of not guilty.
 {¶ 4} In April of 2006, the State filed proposed jury instructions and a jury trial was held. At the jury trial, the following testimony was heard:
 {¶ 5} The State called Trooper Timothy Ehrenborg, a state trooper with the Ohio State Highway Patrol. Trooper Ehrenborg testified that on September 4, 2005, he was in uniform, operating in a marked patrol car, and was pulled into a crossover on U.S. Route 33 watching westbound traffic come out of Columbus and Dublin, Ohio. Trooper Ehrenborg continued that during his patrol, he observed a vehicle approaching, which dropped its speed from 65 to 58 miles per hour, and that when this vehicle passed him, he saw "the driver of the vehicle stiffen up in the seat gripping the wheel." (Tr. p. 58). Additionally, Trooper Ehrenborg noted that the driver's actions were unusual, especially when he was not exceeding the speed limit, and usually indicated that the driver did not have a driver's license, could be wanted, or was drunk, and that based on these observations, he decided to follow the vehicle.
 {¶ 6} Trooper Ehrenborg continued that while following the vehicle, the driver of the vehicle drove across the right edge line approximately two tire widths onto the paved berm and then back into his own lane. Trooper Ehrenborg continued that at this point, he pulled behind the vehicle, activated his emergency pursuit lights, signaled the driver to stop, and used his spotlight to illuminate the interior of the vehicle. Trooper Ehrenborg indicated that when he did this, the driver continued to drive below the speed limit. Trooper Ehrenborg continued that he then activated his audible siren, after which, the vehicle turned on its hazard lights[1] and began to accelerate. Trooper Ehrenborg also indicated that while pursuing the vehicle, he noticed that the front seat passenger appeared to be ducking down in the vehicle; and that he did not see anything thrown from the vehicle. Trooper Ehrenborg also testified that the vehicle reached approximately 90 miles per hour and was gradually weaving between the lanes, and that when the vehicle approached a rest area where a Union County deputy was waiting, who had activated his patrol car's pursuit lights and had came out in front of the vehicle, the vehicle went around the deputy, continued westbound, and increased its speed to over 105 miles per hour.
 {¶ 7} Patrolman Thad Hicks, a police officer with the Marysville Police Department, who testified for the State, indicated that on September 4, 2005, while performing routine patrol in Marysville, Ohio, he was requested to assist in a pursuit of a vehicle, described as a white Lincoln, which was coming into Marysville on U.S. Route 33. Patrolman Hicks continued that after he received the dispatch, he went to U.S. Route 33 and waited in the center median to deploy spike strips to deflate the pursued vehicle's tires; that three other officers were in his vicinity to help stop the pursued vehicle; and, that when the vehicle came past him, the spike strips hit the vehicles' rear tires, which caused the tires to come apart within approximately 100 yards from where he was located.
 {¶ 8} Patrolman Hicks indicated that after the vehicle hit the spikes, "[the vehicle] was weaving around in the roadway, and then it went off into what would be the center median, basically driving right toward Officer Archer, Katie Archer's location of her vehicle. In fact, she had to run back to her car to get out of the way." (Tr. p. 23). Patrolman Hicks continued that the vehicle proceeded to get back onto U.S. Route 33 going westbound and that he went to the vehicle's final resting place.
 {¶ 9} Patrolman Eric Collier, a police officer for the City of Marysville, who testified for the State, indicated that on September 4, 2005, he assisted Patrolman Hicks in stopping the pursued vehicle. Patrolman Collier continued that he was going to the location where Patrolman Hicks was, but when he arrived there, Patrolman Hicks was already there and that by the time he could go to another location, the vehicle and the other officers, which had their overhead lights and sirens on, were already upon them. Patrolman Collier also indicated that the vehicles were approaching from the west on U.S. Route 33 and were going "at least 90 mile (Sic.) an hour." (Tr. p. 38).
 {¶ 10} Patrolman Collier also testified that once the pursued vehicle hit the spike strips, the vehicle veered off the right side of the road and off of U.S. Route 33 and then came back across both lanes of traffic into the median. Patrolman Collier indicated that when the vehicle was going down into the median, it was heading directly at Officer Archer, came within ten to twenty yards of her, and then veered back onto U.S. Route 33. Patrolman Collier continued that when the vehicle ran over the spike strips, he followed the vehicle for approximately a quarter mile until it hit a road sign on the exit ramp of State Route 31. Patrolman Collier also indicated that within a few seconds of the vehicle striking the road sign, he arrived at the vehicle.
 {¶ 11} Patrolman Collier also noted that after the vehicle ran into the road sign, he held the subjects inside the vehicle until other law enforcement personnel arrived. Patrolman Hicks testified that he removed the driver and the front seat passenger from the vehicle, which contained a total of three people.
 {¶ 12} Trooper Ehrenborg indicated that while he followed the vehicle, he watched the vehicle's tires go out. Trooper Ehrenborg continued that once the tires went out, the vehicle began to slide down into a ditch on the north edge of the roadway, accelerated back out of the ditch in front of a semi, spun out toward Officer Archer's police car; that after the vehicle got within nine or ten feet of Officer Archer's police car, the driver powered out and continued westbound onto the U.S. Route 33 off ramp, which provides access to State Route 4 or State Route 31; and, that the vehicle exited on the northbound State Route 31 exit ramp and slid up against a traffic sign where the occupants of the vehicle, including Wilson, were taken into custody.
 {¶ 13} Patrolman Hicks identified Wilson as the driver of the vehicle and noted that he did not say anything, resist being arrested, or attempt to flee, while being taken from the vehicle.[2] Trooper Ehrenborg, who had Wilson placed inside his patrol car, testified that Wilson did not say anything to him, until after he read Wilson his Miranda rights.
 {¶ 14} Trooper Ehrenborg indicated that Wilson stated that the vehicle he was driving belonged to him, but changed his statement to state that it belonged to the rear passenger; that Wilson stated that he was going to Springfield and then trying to go back to Dayton; and, that Wilson shrugged his shoulders and looked out the window when asked why he was running from police.
 {¶ 15} Trooper Ehrenborg also testified that he did not observe Wilson attempt to slow down or pull over, but instead Wilson increased his speed. On cross-examination, Patrolman Collier indicated that he was not part of the pursuit of Wilson's vehicle until after it hit the spike sticks, and on redirect-examination, Patrolman Collier testified that he did not observe whether Wilson intended to pull his vehicle over to stop.
 {¶ 16} Trooper Ehrenborg also noted that the vehicle was towed and an administrative inventory was completed on the vehicle's contents. Trooper Ehrenborg continued that during the administrative inventory of the trunk, he found a box of 357 magnum rounds, small plastic baggies, a digital scale with white powder residue on it, consistent with cocaine, a roll of duct tape, black gloves, and a small sandwich bag that contained nine-millimeter rounds of ammunition, but no weapons were found. Trooper Ehrenborg also indicated that a small bag of marijuana was found in the front seat of the vehicle.
 {¶ 17} Trooper Ehrenborg also testified that all three people in the vehicle were wanted felons. Specifically, Wilson was wanted for a probation violation in Springfield, Ohio. Additionally, Trooper Ehrenborg noted that Wilson had approximately two thousand dollars inside his shoes.
 {¶ 18} On cross-examination, Trooper Ehrenborg indicated that his supervisor, Sergeant Payer, requested a search of the area along the chase for weapons. Patrolman Hicks also testified that he and other officers were a part of this search.
 {¶ 19} On recross-examination, when asked whether he observed "any situations where there was a substantial risk of serious physical harm to either persons or property", Trooper Ehrenborg responded affirmatively. Specifically, Trooper Ehrenborg provided:
 Anybody on the roadway westbound at that time that he had passed could be in harm's way. When people see our lights, most people go to the right and stop. As you can see on the tape, some people stopped directly in the traffic lane. Some people are very observant and they'll see for a great distance away; some people it takes, you know, you being a little bit closer. So, being that the defendant doesn't know that and he's traveling at that speed, a person sees my lights, they stop in the roadway, many possibilities before being spiked.
 Once he's spiked, he continues to drive instead of letting the vehicle come to a stop, comes out in front of a semi, which is approximately 80,000 pounds of vehicle that doesn't stop on a dime. It manages to stop as he spins out in front and then goes down into the ditch. And, actually, he's making his way toward the eastbound lane and then back, continues to drive. Once he spins out again, he comes over toward Officer Archer's car, which, as I said before, was in the grass. He's in the grass as well. He had no tires at that time, so his rear tires or rims, which grabbed the dirt which stopped the rear from spinning out closer to her car, and then he continues on. So there's several instances there that could create risk of — 
(Tr. p. 93-94). Trooper Ehrenborg also agreed that there was no physical damage or serious harm to anybody until after Wilson went over the spike strips.
 {¶ 20} After the State rested, Wilson moved under Crim. R. 29 for acquittal, which the trial court overruled.
 {¶ 21} Wilson's first witness was Bryant Crowley, the front seat passenger in the vehicle Wilson was driving on September 4, 2005. Crowley testified that neither he nor Wilson owned the vehicle; that he wanted Wilson to drop him off in Milford Center, Ohio; and, that after the trooper got behind the vehicle, he told Wilson to keep going. Crowley also testified that there was a gun located inside the vehicle, which was not Wilson's, and that he threw the gun out of the vehicle.
 {¶ 22} After Crowley testified that he threw a gun out of the vehicle, the trial court, Crowley, Wilson's counsel, and the State discussed Crowley's admission, out of the hearing of the jury. During this discussion, Crowley indicated that he did not have the benefit of a lawyer prior to testifying and that he realized that he was confessing to another felony. The State advised Crowley that "[he did] not have to answer questions that would result in criminal activity that [he's] admitting to through [his] statement." (Tr. p. 114). Crowley stated that "No, I want to plead the fifth." The trial court then advised Crowley as follows:
 I'm not trying to talk you out of testifying. I want you to understand, if you want to testify for your buddy, you go ahead and do that, but I want you to understand that if you testify to something like you were just testifying to before we called this halt in this, I'm telling you right now you get prosecuted and you'll take five years for sure on the one charge. You'll take it. Because you just — you just confessed to it. Now, it's your call. You want five more years? It will go conseq. I don't know what you're doing now, but it will go conseq. So, your call. * * * So your call. You tell me what you're going to do and that's what we'll do.
(Tr. p. 115-16). After which, Crowley stated "I'm going to testify." (Tr. p. 116).
 {¶ 23} Crowley then described that inside the vehicle, Wilson, he, and the third passenger, who Crowley said was named "Johnny", were arguing over whether to stop the vehicle. Crowley testified that Wilson had wanted to stop the vehicle, but he and Johnny wanted to keep driving away from the trooper. Crowley also indicated that Johnny was yelling "just ride or die" and that the gun was Johnny's. (Tr. p. 119). Finally, Crowley stated that Johnny threatened to use the gun and that he believed Johnny was sincere in his threats.
 {¶ 24} On cross-examination, Crowley testified that the gun was located near the console of the vehicle so anyone could have access to it. Also, the following exchange between the State and Crowley occurred regarding the gun inside the vehicle:
 Q. Did you not testify that you threw the gun out of the car?
 A. Yeah, I said I threw it out.
 Q. Which means you had your hands on the gun and you allegedly threw the gun out of the car, right, if there was a gun there, correct?
 A. If there was a gun there.
 Q. So there was a gun there, yes or no?
 A. There was a gun there.
 Q. All right. Now, Mr. Crowley, is it not correct that you have been convicted of aggravated robbery in approximately 1993?
 A. 13 years ago? Complicity?
 Q. Aggravated — complicity to aggravated robbery, right?
 A. Complicity. Could have been there. Anything could happen during a complicity.
 * * *
 Q. * * * Now, because you've been convicted of that aggravated robbery, you're not allowed to have a gun, are you?
 A. I didn't say I had a gun. I didn't say I had a gun. I said a gun was there.
 Q. You had access to a gun, right?
 A. Yeah, I threw — after I was told — it was mentioned that it was there.
 Q. You got your hand on it to the extent that you were able to throw it out of the car, right?
 A. Technically, I saved the trooper's life if you want to know.
 Q. Sir, I'm asking you — I'm going to ask the Court here in just a second to instruct you to answer my questions. I don't want editorializing.
 A. Well, I wish not to answer no more questions.
 Q. Pardon?
 A. I wish not to answer no more questions if you want to sit here and badger me.
 Q. Well, you started this door, you opened it.
 A. I'm done. I remain silent.
 Q. Is it not correct that you testified that you grabbed the gun 11 and you threw it out the window — out of the car, correct?
 MR. HORD: Your Honor, I'd ask the Court to instruct the witness.
 THE COURT: Sure. You've got to answer. You made the decision of what you're going to do, now you answer.
 THE WITNESS: No.
 THE COURT: That's not true, is that what you're saying?
 THE WITNESS: I'm not saying — I'm saying — do I have to proceed with this questioning, this —
 THE COURT: That's right. That's right. You — you started answering the questions after everything's been explained to you, now you answer his question.
 * * *
 THE WITNESS: I do have a right to the fifth amendment right?
 THE COURT: Is that what you're taking, the fifth amendment now at this point?
 THE WITNESS: That's right.
 MR. HORD: All right.
 THE COURT: And I assume that that's on the ground that anything you say might — — would then incriminate you; is that right?
 THE WITNESS: Yes, sir.
 THE COURT: All right.
(Tr. pp. 123-25).
 {¶ 25} Following this exchange, Crowley also admitted that on September 4, 2005, there was a warrant out for his arrest in Clark County, Ohio. Crowley also identified a letter that he wrote to Wilson, which was dated September 25, 2005. However, when the State began to ask questions regarding the letter, Crowley again asserted hisFifth Amendment privilege.
 {¶ 26} After Crowley reasserted his Fifth Amendment privilege, Wilson's counsel did not conduct any re-direct examination of Crowley, except to clarify whether Crowley was being facetious or telling the truth after he answered a jury question which indicated that the gun inside the vehicle was a squirt gun. To which, Crowley responded, "It was a squirt gun. That's the truth." (Tr. p. 132).
 {¶ 27} After Crowley completed his testimony, the State made a motion in limine on the four witnesses that Wilson's counsel had intended to have testify on Wilson's behalf, which the trial court granted.
 {¶ 28} Subsequently, Wilson testified on his own behalf. Wilson testified that on September 4, 2005, he was traveling west on U.S. Route 33 in Jonathan Ingram's white Lincoln. Wilson indicated that while he was traveling westbound, police "got behind us, and both of my passengers said they had serious warrants, wanted for robbery, a bunch of robberies." (Tr. p. 138). Wilson continued that both passengers said that they did not want to go back to jail and that he told them that they could give the police officers false information. Wilson also stated that he wanted to pull over but threats were made if he stopped. Specifically, Wilson stated that Ingram and Crowley were reaching for a gun, which was located in the vehicle, and that they both told him that he should not pull over.
 {¶ 29} Wilson also indicated that he believed either Ingram or Crowley would have used the gun if he had stopped. Specifically, Wilson stated:
 [Ingram and Crowley] said that the officer would approach the vehicle on the passenger side because he didn't want to be in the way of traffic and that the officer would be shielded from the side — the line of sight from the highway, and it was dark and he was alone and the highway was empty. And I guess [Ingram] was going to shoot him when he came to the * * * passenger door and bent in to ask for me (Sic.) and Crowley's ID. That was — that was the original plan. And then — then they said that they would jump out and tie him up and take his gun and [Crowley] was going to knock him out.
(Tr. p. 141). Wilson also testified that he never actually saw a gun in the vehicle, but that he heard it; that Crowley's window was down while he was driving; and, that he turned on the vehicle's hazard lights to indicate to the police officer that there was a hazard in the car.
 {¶ 30} On cross-examination, Wilson agreed that his idea was to pull over, show his driver's license and proof of insurance, and Ingram and Crowley would provide false information to the police officer. Also, Wilson stated that it was his understanding that a gun was thrown out of the vehicle, while he was driving; that there was a warrant out for him because he had a probation violation; that when he hit the spike strips, the car went completely out of control and he was trying to control it, but could not remember almost hitting a police officer.
 {¶ 31} After Wilson testified, the defense rested. At the conclusion of the jury trial, the jury found Wilson guilty of failure to comply with an order or signal of a police officer in violation of R.C. 2921.331(B), (C)(5)(ii), a felony of the third degree. Subsequently, Wilson was sentenced to four years in prison.
 {¶ 32} It is from this judgment Wilson appeals, presenting the following assignments of error for our review:
 Assignment of Error No. I THE TRIAL COURT ERRED WHEN IT PERMITTED A DEFENSE WITNESS TO MAKE A BLANKET INVOCATION OF THE FIFTH AMENDMENT PRIVILEGE TO NOT INCRIMINATE HIMSELF AFTER HE HAD ALREADY MADE STATEMENTS THAT IMPLICATED HIM IN OTHER CRIMINAL ACTIVITY, WHICH RESULTED IN INCOMPLETE TESTIMONY OF THAT WITNESS, THEREBY PREJUDICING APPELLANT'S ABILITY TO CALL CERTAIN WITNESSES.
 Assignment of Error No. II THE TRIAL COURT ERRED WHEN IT OVERRULED THE STATE'S OBJECTIONS TO THE JURY INSTRUCTIONS AND VERDICT FORM AS GIVEN TO THE JURY.
 Assignment of Error No. III APPELLANT DID NOT RECEIVE A FAIR TRIAL AS A RESULT OF COUNSEL'S PERFORMANCE.
 Assignment of Error No. I {¶ 33} In his first assignment of error, Wilson argues that the trial court erred when it permitted Crowley to make a blanket invocation of his Fifth Amendment privilege after he had already made statements that implicated him in other criminal activity.
 {¶ 34} The Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution provide an accused with a right of compulsory process to obtain a witness' testimony or evidence.Pennsylvania v. Ritchie (1987), 480 U.S. 39, 56; Columbus v. Cooper
(1990), 49 Ohio St.3d 42,
44. However, an accused's constitutional right of compulsory process is limited by the rules of evidence. State v. Denis (1997),117 Ohio App.3d 442, 446; State v. Haley (Dec. 2, 1999), 8th Dist. No. 74718, appeal not allowed by State v. Haley (2000), 88 Ohio St.3d 1434. Evid. R. 103(A)(2) requires an offer of proof in order to preserve any error in excluding evidence, unless the substance of the excluded evidence is apparent from the record. See State v. Brooks (1989), 44 Ohio St.3d 185,195; State v. Grubb (1986), 28 Ohio St.3d 199, paragraph two of the syllabus. An offer of proof generally requires that the party proffer to the court the substance of the desired testimony and how it would have been relevant and material to the defense. Brooks, 44 Ohio St.3d at 195. An offer of proof is necessary to preserve procedural errors in the invocation of a witnesses' Fifth Amendment privilege. Hayley, supra.
 {¶ 35} As noted above, after Crowley testified that he threw a gun out of the vehicle, the trial court, Crowley, Wilson's counsel, and the State discussed Crowley's admission, outside the presence of the jury. During this discussion, Crowley was instructed on his right to invoke his Fifth Amendment privilege. After the discussion, Crowley continued to testify, but later invoked his Fifth Amendment privilege.
 {¶ 36} Wilson failed to proffer to the trial court the substance of Crowley's expected testimony, after he invoked his Fifth Amendment
privilege, or explain how further testimony would have been relevant or material to his defense. Therefore, Wilson effectively waived any error by failing to properly preserve the issue for review. See, e.g.,State v. Boddie, 3d Dist. No. 1-2000-72, 2001-Ohio-2261.
 {¶ 37} Accordingly, Wilson's first assignment of error is overruled.
 Assignment of Error No. II {¶ 38} In his second assignment of error, Wilson argues that the trial court erred when it overruled the State's objections to the jury instructions and verdict forms as given to the jury. Specifically, Wilson argues that a separate verdict form was required for the jury to make a second finding that Wilson created a substantial risk to persons or property for a felony violation of R.C. 2921.331(B), (C)(5)(ii).
 {¶ 39} At trial, the trial court provided the jury with the following instruction:
 Now, the issues in this case are this. The defendant, Terrence L. Wilson[3], is charged with failure to comply with an order or signal of a police officer. Before you can find defendant guilty, you must find beyond a reasonable doubt that on or about the 4th day of September, 2005, in Union County, Ohio, the defendant operated a motor vehicle so as to willfully elude or flee a police officer after receiving a visible and/or audible signal from the police officer to bring his motor vehicle to a stop, and the operation of the motor vehicle by Terrence L. Wilson caused a substantial risk of serious physical harm to persons and/or property. This constitutes the offense of failure to comply with an order or signal of a police officer, in violation of Ohio Revised Code Section 2921.331(B)(C)(5)(ii).
(Tr. p. 188). The trial court also provided proper jury instructions on "willfully", "serious physical harm", "substantial suffering", "serious physical harm to property", and "substantial risk." After providing some further jury instructions, the trial court asked the State whether it had "any objections, correction[s], additions, [or] deletions?" (Tr. p. 194). The State responded that the Ohio Jury Instructions required two findings for a violation of R.C. 2921.331(B), (C)(5)(ii). Specifically, the State noted that according to the Ohio Jury Instructions, the jury needed to make a second finding of whether there was a substantial risk of serious physical harm to persons or property in order to have felony failure to comply instead of a misdemeanor failure to comply. Wilson's counsel responded to the State's comments that it would not object to the jury instructions.
 {¶ 40} We begin by noting that Wilson's counsel did not object to the aforementioned jury instruction nor did he file proposed jury instructions. Crim. R. 30(A) provides, in pertinent part, that "[a] party may not assign as error the giving or failure to give any instructions unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection." The rationale behind this rule is that the court should be made aware of alleged errors in the instructions when it still has an opportunity to correct the mistake or defect. Presley v.Norwood (1973), 36 Ohio St.2d 29, 33 (construing the analogous Civ. R. 51(A)). Where a party fails to interpose a specific objection to the court's instructions, the error is waived absent a finding of plain error. State v. Underwood (1983), 3 Ohio St.3d 12, paragraph one of the syllabus; State v. Lane (1976), 49 Ohio St.2d 77, paragraph one of the syllabus. However, this rule has not been applied so rigidly as to require a formal objection in every case.
 {¶ 41} In State v. Wolons (1989), 44 Ohio St.3d 64, 67, the Ohio Supreme Court noted, "if a party makes his position sufficiently clear to give the court an opportunity to correct a mistake or defect, then the rationale for formally objecting is no longer present." The Court held that the failure to formally object following a trial court's refusal to instruct the jury on a given matter does not waive the error (1) where the record affirmatively shows that a trial court has been fully apprised of the correct law governing a material issue in dispute, and (2) the requesting party has been unsuccessful in obtaining the inclusion of that law in the trial court's charge to the jury. Id. at paragraph one of the syllabus.
 {¶ 42} However, reviewing the record, we find that in this case the State did not actually request that the trial court change its jury instruction to include a specific finding to enhance the charges against Wilson from a misdemeanor to a felony. Therefore, Wilson's failure to interpose a specific objection to the court's instructions waives all error absent a finding of plain error. Crim. R. 52; State v. Long (1978),53 Ohio St.2d 91, 94. An erroneous jury instruction does not constitute plain error unless, but for the error, the outcome of the trial clearly would have been otherwise. State v. Cooperrider (1983),4 Ohio St.3d 226, 227.
 {¶ 43} It is well settled that a criminal defendant is entitled to a complete and accurate jury instruction on all issues raised by the evidence. State v. Williford (1990), 49 Ohio St.3d 247, 251. When reviewing the trial court's charge, a "single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." State v. Price (1979), 60 Ohio St.2d 136, 141, citing Cupp v. Naughten (1973), 414 U.S. 141, 146-47. Viewing the instructions in their totality, if the law is clearly and fairly expressed, a reviewing court should not reverse a judgment based upon an error in a portion of a charge. Margroff v. Cornwell Quality Tools,Inc. (1991), 81 Ohio App.3d 174, 177; Yeager v. Riverside MethodistHosp. (1985), 24 Ohio App.3d 54, 55. Furthermore, there is a strong presumption in favor of the adequacy of jury instructions. Instructions which, in their totality, are sufficiently clear to permit the jury to understand the relevant law shall not be the cause of a reversal upon appeal. Schade v. Carnegie Body Co. (1982), 70 Ohio St.2d 207, 210.
 {¶ 44} Upon our review of the record, the trial court's entire charge to the jury reveals that the jury was given a proper instruction for failure to comply with an order or signal of a police officer. Also, we cannot find that, but for Wilson's alleged error, the outcome of the trial clearly would have been otherwise, because at trial, there was sufficient evidence describing Wilson's driving during the police pursuit, which supported the jury's conviction.
 {¶ 45} Accordingly, Wilson's second assignment of error is overruled. Assignment of Error No. III {¶ 46} In his third assignment of error, Wilson argues that he was deprived of his right to effective assistance of counsel and was prejudiced as a result. Specifically, Wilson asserts that his trial counsel erred by failing to file proposed jury instructions; that his trial counsel erred by failing to object to the jury instructions and verdict forms given to the jury; and, that his trial counsel failed to proffer the testimony from Crowley, after Crowley invoked hisFifth Amendment right.
 {¶ 47} An ineffective assistance of counsel claim requires proof that a trial counsel's performance fell below objective standards of reasonable representation and that the defendant was prejudiced as a result. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of syllabus. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, but for counsel's errors, the outcome at trial would have been different. Id. at paragraph three of syllabus. "Reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. State v. Waddy (1992),63 Ohio St.3d 424, 433, superseded by Constitutional amendment on other grounds as recognized by State v. Smith, 80 Ohio St.3d 89, 103, 1997-Ohio-355.
 {¶ 48} Furthermore, the court must look to the totality of the circumstances and not isolated instances of an allegedly deficient performance. State v. Malone (Dec. 13, 1989), 2d Dist. No. 10564. "Ineffective assistance does not exist merely because counsel failed `to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it.'" Id. quoting Smith v. Murray (1986),477 U.S. 527, 535.
 {¶ 49} Trial tactics that are debatable generally do not constitute a deprivation of effective counsel. State v. Phillips, 74 Ohio St.3d 72,85, 1995-Ohio-171. Furthermore, trial counsel's failure to make objections is within the realm of trial tactics and does not establish ineffective assistance of counsel. State v. Lockett (1976),49 Ohio St.2d 48, paragraph nine of the syllabus, reversed in part byLockett v. Ohio (l978), 438 U.S. 586, overruled on other grounds inState v. Downs (l977), 51 Ohio St.2d 47.
 {¶ 50} We begin with Wilson's assertion that his trial counsel erred by failing to file proposed jury instructions. Specifically, Wilson alleges that the testimony provided that he was justified in failing to comply with the police officer's orders; therefore, his trial counsel was deficient for failing to elicit a jury instruction on his "justification" defenses. Also, Wilson alleges that his trial counsel erred in not providing an alternative definition for "willful."
 {¶ 51} Upon our review of the record, it is our conclusion that the claim of ineffective assistance of counsel regarding the failure to raise Wilson's "justification" defense is meritless. At trial, Crowley testified that there was a gun, which he later claimed was a squirt gun, located inside the vehicle, and that he threw the gun out of the vehicle. Also, Wilson testified that he wanted to pull over, but Ingram and Crowley were reaching for a gun and told him that he should not pull over. Additionally, Wilson indicated that he believed that either Ingram or Crowley would have used the gun if he had stopped. Wilson also described in great detail what Ingram or Crowley would have done if he had stopped; however, Wilson testified that he never actually saw a gun in the vehicle, but that he heard it. Also, Wilson stated that it was his understanding that a gun was thrown out of the vehicle, while he was driving; that he had a warrant out for him, because he had a probation violation; that when he hit the spike strips, the car went completely out of control and that he was trying to control it, but could not remember almost hitting a police officer. Furthermore, Wilson has not demonstrated that the outcome of the proceedings would have been different had his counsel acted in the manner he suggests. Accordingly, we cannot find that
Wilson's counsel's failure to elicit a jury instruction on his "justification" defenses results in ineffective assistance of counsel.
 {¶ 52} Also, Wilson alleges that his trial counsel erred in not providing an alternative definition for "willful." As noted above, the jury was given proper instructions on the definition of "willful." Specifically, the jury was instructed,
 A person acts willfully when it is his specific intention to cause a certain result. Is (Sic.) must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to elude or flee.
(Tr. p. 188). The definition given to the jury is legally consistent with the language in R.C. 2901.22(A) that defines the word "willfully" as it relates to criminal acts. Moreover, the definition is correct and appropriate to the facts of this case. See 4 Ohio Jury Instructions (2006), 521.331 (drafted to correspond to R.C. 2901.22(A)). Therefore, the jury was clearly and accurately instructed on the definition of "willful." Accordingly, it follows that Wilson's counsel's failure to file an alternative to the jury instruction given was objectively neither deficient nor unreasonable.
 {¶ 53} Additionally, Wilson argues that his trial counsel erred by failing to object to the jury instructions and verdict forms given to the jury. Since we have found in Wilson's second assignment of error that the outcome of this case would not have clearly been different but for Wilson's counsel failing to object to the jury instructions and verdict forms, we cannot find that the result of Wilson's trial would have been different had his attorney objected to the jury instruction and verdict forms. Thus, even if we were to find deficient performance in the trial attorney's failure to object, such alleged deficiency did not rise to the level of ineffective assistance of counsel since a probable difference in the trial's result cannot be established.
 {¶ 54} Finally, Wilson argues that his trial counsel was deficient for failing to proffer testimony from Crowley, after Crowley invoked hisFifth Amendment privilege, as well as other witnesses Wilson's counsel was going to have testify. However, Wilson has not demonstrated that the outcome of the proceedings would have been different had his counsel acted in the manner he suggests. Therefore, we cannot find that Wilson's counsel's failure to proffer testimony from Crowley and the other witnesses results in ineffective assistance of counsel.
 {¶ 55} Accordingly, Wilson's third assignment of error is overruled.
 {¶ 56} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment affirmed. BRYANT, P.J., and SHAW, J., concur.
[1] Patrolman Eric Collier also noted that the vehicle had its hazard lights on when it came up U.S. Route 33.
[2] Patrolman Collier and Trooper Ehrenborg also testified that the driver of the vehicle was Wilson. Patrolman Collier also testified that Wilson did not attempt to run or resist being arrested.
[3] We note that Appellant's brief indicates that Appellant's first name is spelled "Terrance"; however, multiple times in Appellee's brief and the record, Appellant's first name is spelled "Terrence."