OPINION *Page 2 
{¶ 1} Defendant-appellant, Gabriel DeMarcus Williams ("Williams"), appeals the Marion County Court of Common Pleas judgment of conviction and imposition of sentence. For reasons that follow, we affirm.
 {¶ 2} On August 13, 2006, Darren Landon ("Landon") was driving in his Honda Civic along with Troy Queen ("Queen") near Jefferson Street in Marion, Ohio when they encountered Robert Baker[1] ("Baker"), an acquaintance of Queen. (Sept. 24-27, 2007 Tr. Vol. III at 475-77).[2]
Baker flagged them down as they were driving and asked them if they would be interested in making some money. (Id. at 477); (Tr. Vol. IV at 649). Landon and Queen indicated that they would like to hear more about how they could make the money. (Tr. Vol. IV at 650). Baker told Landon and Queen if they took money that was owed to him from a house on Uncapher Avenue, that he would pay them a portion of the money they took. (Id. at 651); (Tr. Vol. III at 478). Baker pointed out the targeted house on Uncapher Avenue to Landon and Queen; informed them that there was around seven to eight thousand dollars ($7-8,000) in the house; and informed them that there might be a male and female inside the house. (Tr. Vol. III at 479). At some point during the planning of this home invasion, Baker introduced Landon and Queen to Williams. (Id. at 480); (Tr. Vol. IV at 652-653). Williams was a friend of Baker and was to *Page 3 
assist Landon and Queen in the home invasion. (Tr. Vol. III at 482); (Tr. Vol. IV at 653-54).
 {¶ 3} After 12:00 a.m. on August 14, 2006, Williams, Queen, and Landon broke into the home of Jamie Snyder ("Snyder") located at 403 Uncapher Avenue. (Tr. Vol. III at 482-83); (Tr. Vol. II at 301). Snyder and Jerry Miller, a twelve (12) year old boy she takes care of, were asleep in separate bedrooms when Williams, Queen, and Landon broke into the home. (Tr. Vol. II at 299, 301). Williams, armed with a loaded handgun, along with Queen and Landon, armed with knives, entered Snyder's bedroom, woke her up, and demanded money. (Id. at 302, 304).
 {¶ 4} Snyder was able to give the men around four hundred to six hundred dollars ($400-600) in cash, but the men demanded more. (Id. at 305). The men took Snyder into her living room, tore the electrical cords from her lamps, and bound her arms and legs behind her back. (Id. at 306). The men told Snyder that they would kill her and the young boy if she did not give them more money. (Id. at 302-08, 332); (Tr. Vol. III at 483-85). Williams ordered Snyder to call people for money, and Snyder called her brother, Jeremy Hutchinson, and her uncle, Michael Deickert. (Tr. Vol. II at 307-08); (Tr. Vol. IV at 484-85); (Tr. Vol. I at 169,173).
 {¶ 5} After talking with Snyder on the phone, Deickert became suspicious, drove to Hutchinson's house, and the two of them drove over to Snyder's house. *Page 4 
(Tr. Vol. I at 172-75). When the two arrived at Snyder's house, they pulled into an alley alongside the house. Soon after, they saw a white male come from the front of the house and later saw a black male come from the rear of the house. (Id. at 178, 180). Both males eventually went to a parked Honda Civic. (Id. at 182). Thereafter, Snyder ran out of the house and told Deickert and Hutchinson that she had just been robbed. (Id. at 184). Deickert and Hutchinson then pursued the Honda Civic and called 9-1-1. (Id.). Approximately five minutes after the police were notified, the police stopped the Honda Civic. (Tr. Vol. II at 250-51). Williams, Queen, and Landon were placed under arrest.
 {¶ 6} On August 23, 2006, the Marion County Grand Jury jointly indicted Williams, Landon, and Queen. Williams was indicted on seven counts, including: count one for aggravated burglary, in violation of R.C. 2911.11(A)(1), a first degree felony with a three year gun specification pursuant to R.C. 2941.145; 2929.14(D); count two for aggravated robbery, in violation of R.C. 2911.01(A)(1), a first degree felony with a three year gun specification pursuant to R.C. 2941.145;2929.14(D); count three for kidnapping, in violation of R.C. 2905.01(A)(2), a first degree felony with a three year gun specification pursuant to R.C. 2941.145; 2929.14(D); count four for intimidation of a victim or witness in a criminal case, in violation of R.C. 2921.04(B), a third degree felony; count six for tampering with evidence, in violation of R.C. 2921.12(A)(1), a third degree felony with a three year gun specification pursuant to R.C. 2941.145; 2929.14(D); count seven *Page 5 
for possession of heroin, in violation of R.C. 2925.11(A), (C)(6), a fifth degree felony with a one year gun specification pursuant to R.C. 2941.141; 2929.14(D); and count eight for having a weapon while under disability, in violation of R.C. 2923.13(A)(3), a third degree felony.
 {¶ 7} Co-defendants Landon and Queen plead guilty prior to trial pursuant to plea negotiations. Williams and co-defendant Baker were tried jointly in a four day jury trial conducted on September 24-27, 2007. Williams was found guilty on all counts, including the gun specifications, except count six, tampering with evidence. Baker was acquitted on all charges.
 {¶ 8} On November 14, 2007, the trial court sentenced Williams to twenty-four (24) years imprisonment. On December 17, 2007, Williams filed an appeal to this Court asserting six assignments of error for our review. We have elected to address Williams' assignments of error out of the order they appear in his brief.
 ASSIGNMENT OF ERROR NO. IV THE JURY'S GUILTY VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 9} In his fourth assignment of error, Williams argues that the jury's guilty verdict was against the manifest weight of the evidence. Specifically, Williams argues that the State failed to present any physical evidence linking him to the Uncapher Avenue home invasion. Williams further points to several inconsistencies in the testimony presented, which he claims raise serious doubt as *Page 6 
to his guilt, and he argues that several of the witnesses were not credible and were biased against him.
 {¶ 10} The State, on the other hand, argues that the evidence against Williams was overwhelming. The State contends that several critical facts were proven to establish Williams' guilt beyond a reasonable doubt: (1) Williams was caught with co-defendants Landon and Queen fleeing from the scene of the crime; (2) Williams had stolen property in his pants' pockets; and (3) Williams was found wearing black Dickies® clothing that matched Landon's and Queen's clothing. Furthermore, the State argues that several witnesses linked Williams with the home invasion, including co-defendants Landon and Queen, Barlow, Criswell, Snyder, Deickert, and others. We agree with the State that the jury verdict in this case was not against the manifest weight of the evidence.
 {¶ 11} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "`[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence *Page 7 
and the credibility of the witnesses. State v. DeHass (1967),10 Ohio St.2d 230, 231, 227 N.E.2d 212.
 {¶ 12} During the trial, the jury heard testimony from several witnesses, law enforcement officers, and forensic experts. The jury also heard testimony from Landon and Queen, the two men that invaded the home with Williams. Darren Landon testified that he was currently incarcerated for aggravated burglary, aggravated robbery, kidnapping, and failure to comply with a signal from an officer for his involvement in the August 14, 2006 home invasion. (Tr. Vol. III at 473). Landon testified that on the night of August 13, 2006, he and Troy Queen were near Jefferson Street in Marion when they were flagged down by a friend of Queen named Robert Baker. (Id. at 475-76). Queen and he went to Baker's house on Jefferson Street where the three of them discussed taking money from a house on Uncapher Avenue. (Id. at 477-78). Landon testified that Baker took Queen and him to the house and told them: that the bedroom was "straight through the back door"; that there may be a male and female present in the home; and that they would find seven to eight thousand dollars in the home. (Id. at 479).
 {¶ 13} Landon further testified he met Williams at Baker's house on Jefferson Street. (Id. at 480). Landon testified that, according to the plan conceived by Baker, Williams, Queen, and he were to break into the house on Uncapher and take the money for Baker, and Baker would pay them $1,000. (Id. at 482). Landon further testified that: Williams, Queen, and he were dressed in black *Page 8 
clothing; Queen had a butterfly knife; he had a lock-blade knife; Williams had a gun; the three of them used his car, a Honda Civic; and Williams rode in the back passenger's seat. (Id. at 480-81); (State's Exs. 16J-K, 16N-O, 26, 33, 2, 2A, 2D, 16A-B).
 {¶ 14} When they arrived at the house on Uncapher, the three of them went on the back porch, kicked in the back door, and entered the home according to Landon. (Id. at 482-83); (State's Exs. 9A-D, 10A-C). Landon testified that they immediately went to the bedroom, asked the woman who else was in the house, brought her out to a sofa, took all the cell phones, disconnected all the phones, and began demanding money. (Id. at 483). When the woman denied having any money, they "searched through several tins, collectable tins and such, plastic containers, flipped the bed, things of that matter" in an attempt to find money. (Id. at 483-84); (State's Exs. 10L-S). Landon testified that they tied up the victim with coaxial cable that was cut from the wall, and then, Williams told the victim to call other people and get money. (Id. at 484); (State's Exs. 10D-G). Landon testified that soon after the victim made the phone calls a car arrived at the house, and they ran from the house back to their car. (Id. at 485). According to Landon, Williams came to the car with a black duffle bag and the gun. (Id. at 486); (State's Exs. 16E, 16F-H).
 {¶ 15} The three of them sped away in the car but soon realized that a car was following them. (Id.). Eventually, the police stopped their car. (Id. at 488). *Page 9 
Landon testified that he did not know what happened to the gun, but Williams had the gun last in the house. (Id.). Landon also identified Queen's butterfly knife and his lock-blade knife. (Id. at 489-90); (State's Exs. 26, 33). Landon testified that, following his arrest, he told the police that Queen, Williams, and he broke into the house on Uncapher, and that he was testifying pursuant to subpoena. (Id. at 491).
 {¶ 16} On cross-examination, Landon testified that he told law enforcement that the black male kicked in the victim's back door. (Id. at 502). When pressed by counsel, Landon testified that he did not remember kicking in the door. (Id.). Landon denied ever being told by police that the shoe print on the back door matched his shoes. (Id. at 503). Landon also denied ever touching the gun during the home invasion and testified that it would surprise him if the victim testified otherwise. (Id. at 503-04). Landon admitted that he initially lied to police and told them that he did not tie up the victim, but later confessed that he did tie her up. (Id. at 505-06). Landon further admitted that "* * * a lot of things * * * are still pretty fuzzy * * * because * * * it happened a year ago and things tend to get fuzzy after a period of time." (Id. at 513). Landon testified that, as part of his plea deal, he would get out of prison in eight years because the State would not oppose judicial release. (Id. at 515).
 {¶ 17} Troy Queen, the other co-defendant involved in the home invasion, confirmed much of Landon's testimony. Queen testified that, on August 13, 2006, he and Landon were driving on Jefferson Street in Marion when they encountered *Page 10 
Baker. (Tr. Vol. IV at 648). Baker asked him if he was interested in making some money, and he said "yeah." (Id. at 649-50). According to Queen, Baker agreed to "give [him] and Darren Landon some money if we'd go and pick up some money for him on Uncapher." (Id. at 651). Queen also testified that Williams was present during the discussions, and that Williams showed Landon and him the target house on Uncapher. (Id. at 652-53). Queen confirmed that both Landon and he had knives, but Williams had a gun. (Id. at 653-54).
 {¶ 18} Queen also testified about the clothing they wore the night of the home invasion. Queen testified that he wore all black Dickies® clothing, and he identified several items of clothing admitted at trial as his. (Id. at 656); (State's Exs. 34, 35). Queen also testified that Williams was wearing black clothing similar to that worn by Landon and him, because Landon and Williams went to pick up the black clothing together prior to the home invasion. (Id. at 657-58).
 {¶ 19} Queen testified that Williams, Landon, and he left Baker's house on Jefferson Street to commit the Uncapher Avenue robbery. (Id. at 658). Queen confirmed that Landon was driving, but testified that Williams was "telling us what we were going in there and do [sic], he told me I was gonna go in there and search the bedroom and search the house for the money while [Landon] was to tie up the female." (Id. at 659). Queen testified that Landon kicked in the back door to the house, they went into the back bedroom, and ordered the female victim out into the living room. (Id. at 659-60). Queen testified that Landon tied up the *Page 11 
victim; he searched the house for money; and Williams was threatening the victim with the gun trying to find out where the money was hidden. (Id. at 661). According to Queen, Williams told the victim that he "was gonna shoot her." (Id.).
 {¶ 20} Queen testified that Williams instructed the victim to make phone calls to get the money. (Id. at 662). Queen confirmed that they fled from the house because "* * * we were being chased by somebody." (Id. at 663). Queen also identified the stolen duffle bag, and testified that Williams took it from the house. (Id.); (State's Ex. 17). When the three of them left in the car, Landon was driving; Williams was in the back seat; and Queen was in the front passenger's seat. (Id. at 664-65). Queen also testified that Williams threw the gun out the back window of the car as they were fleeing because the police were chasing them. (Id. at 665-66). When he was questioned by the police, Queen told the police about the plan to invade the home and confessed to his involvement. (Id. at 668-69). Queen testified that he was prosecuted, plead guilty pursuant to a plea deal, and was sentenced to seven years eleven months imprisonment. (Id. at 669-70, 707). Queen also acknowledged that, as part of his plea deal, he could be released after five years. (Id. at 670-71).
 {¶ 21} On cross-examination, Queen denied ever witnessing Landon touch the gun while in the home, but did reconfirm that Landon, not Williams, kicked in the back door to the house. (Id. at 679). Queen also testified that when they fled from the house Landon and he went out the front door, but Williams went out the *Page 12 
back door. (Id. at 683). Queen denied, however, ever picking up a black male while they were fleeing the scene of the crime. (Id. at 686). Queen also admitted to a prior breaking and entering conviction and admitted lying to the police to avoid prosecution in that case. (Id. at 708-10).
 {¶ 22} The jury heard testimony from two independent witnesses who confirmed the meeting between Baker, Williams, Landon, and Queen to plan the home invasion. Niki Barlow testified that, in August 2006, she lived at 176 Jefferson Street with her three-year old son, Shelly Butcher, and Robert Baker. (Tr. Vol. II at 362, 364, 366). Barlow testified that a heavier set white guy and a skinny white guy along with Williams were at her house on August 13, 2006, and that they discussed getting $12,000 from a house suggested by Baker. (Id. at 367, 369-71). Barlow testified that Baker gave the three other men a gun he received from Tywhon, aka "Hus," one of Baker's neighbors, and Baker and Hus showed the three men the house where the money was located. (Id. at 372-74). She also testified that Williams went to the store and purchased the black Dickies® clothing, and that she witnessed Williams and the two white guys leave the house to commit the robbery. (Id. at 374-76).
 {¶ 23} On cross-examination, Barlow denied having any kind of relationship with Baker. (Id. at 398-99). Barlow testified that law enforcement "basically" told her if she did not cooperate they would take her child from her, and law enforcement intimidated her. (Tr. Vol. III at 407-08). Barlow testified *Page 13 
that she knew Williams prior to this incident, but that law enforcement did not have her identify Williams from a photo array. (Id. at 408-09).
 {¶ 24} Joshua Stillwell testified that, in August 2006, he was living near the corner of Jefferson and Wilson Streets about a block and a half away from where Barlow lived. (Id. at 527). Stillwell testified that he stopped by Barlow's house on August 13, 2006 and witnessed Barlow, Butcher, Williams, Baker, Queen, and Landon all at the residence. (Id. at 528). Stillwell testified that Queen, Landon, and Williams were dressed in dark clothes, and they were discussing a "lick."[3]
Stillwell testified that he witnessed Landon, Queen, and Williams leave together; the white guys seemed nervous when they left; and Baker stayed at Barlow's house. (Id. at 532-33).
 {¶ 25} On cross-examination, Stillwell admitted that he had recently served time in the county jail for a community control violation. (Id. at 537). He also admitted to serving two years imprisonment for violating his community control on a 2002 robbery conviction and estimated that he had four or five community control violations in total. (Id. at 539). Stillwell also testified that he briefly discussed the August 14, 2006 robbery with Landon when they were in jail together. (Id. at 540-41). Stillwell explained that Landon was asking him more about prison than explaining the robbery to him. (Id. at 541). *Page 14 
 {¶ 26} The jury heard testimony from the victim. Jamie Snyder testified that she lived at 403 Uncapher along with Jerry Miller, a twelve (12) year old boy she cares for, in August 2006. (Tr. Vol. II at 298-99). Snyder testified that on August 13, 2006 she was in the Uncapher residence with Miller, and around midnight she went to bed. (Id. at 301). During the early morning hours of August 14, 2006, she woke up to the sound of her back door being kicked in. (Id. at 302). Snyder testified, "I just heard the noise and I looked up and just saw three guys running in * * * to my bedroom * * * yelling, wanting money, and they had a gun." (Id.). Snyder described the perpetrators as two white guys, one tall and skinny and the other one shorter and chunkier, and one black guy, medium build, all dressed in dark clothing. (Id.). Snyder testified that the black male had sunglasses over his eyes and was wearing a black toboggan or "snow hat". (Id. at 303). Snyder was, however, unable to identify Williams as the black guy who invaded her home, because "the black guy that was in the house had his face pretty well covered." (Id. at 304, 340). The black guy was holding a gun on her when the men first entered her bedroom. (Id. at 358).
 {¶ 27} Snyder testified that the chunky white guy, i.e. Landon, and the black guy had both a gun and a knife. (Id.). According to Snyder, "[a]t one point one of `em would have the gun, the other point the other one would. They just went back and forth." (Id. at 305, 355). Snyder testified that the men were asking her for $10,000 in cash, but she was only able to give the black male $400 to $600. *Page 15 
(Id. at 305-06, 336). Snyder further testified that: the men ripped the electrical cord off one of her lamps and tied her hands and feet behind her back; ripped a piece from one of her blankets and covered her mouth to prevent her from screaming; and searched the house for money. (Id. at 306, 314); (State's Exs. 10G-I, 14C-D). Snyder further testified that the chunky white guy had a knife and a gun, and the black guy held the gun in her face. (Id. at 328-29). According to Snyder, "most of the time the gun was at [her] head," and the black guy threatened to kill her if she did not give them the money, while the chunky white guy was trying to calm her down. (Id. at 355-56). Snyder further testified that the men suggested that she meet them the next day with the money and threatened to kill Miller, the twelve year old boy, if she did not show up with the money. (Id. at 359). Snyder also testified that the men demanded that she call other people for the money, and she talked to her uncle and told him to go to her brother's house and tell him "his friends was here and they wanted their money." (Id. at 307-08).
 {¶ 28} Regarding the items stolen from her home, Snyder testified that the black man took most of her property, including: $400 to $600 in cash, her wedding rings, PlayStation® 2 games, DVDs, a duffle bag, a Footlocker® bag, a shoebox, and two cell phones. (Id. at 361, 305, 312); (State's Exs. 16E-M). Snyder identified several of the CDs found in Williams' pockets at the time of arrest as belonging to her. (Id. at 316). Several other DVDs Snyder identified as belonging *Page 16 
to Miller or Cheyenne.[4] (Id. at 320). Several of the PlayStation® 2 games found on Williams were marked with the initials "J.M.," which Snyder identified as "Jerry Miller," the twelve year old boy; these included: "Championship Racing," "NFL Quarterback, Club 97," "Tomb Raider," "The Last Revelation," and "Tony Hawk's Pro Skater 2," all of which Snyder identified as belonging to Miller. (Id. at 318-20); (State's Ex. 16G). Snyder also identified the two cell phones found with Williams as belonging to her and Miller. (Id. at 322, 338) (State's Exs. 19, 20). Snyder identified the Footlocker® bag and duffle bag found with Williams and the contents inside the Footlocker® bag as belonging to her husband, Brad. (Id. at 323); (State's Exs. 24, 17). Snyder identified the prescription medication found in Williams' pockets as OxyCotin[5]
that was in her bedroom and belonged to her husband. (Id. at 324-25); (State's Ex. 31). Snyder identified a scale that was found with Williams that was stolen from her home. (Id. at 325); (State's Ex. 25). Snyder also identified photos taken by police of her stolen wedding rings. (Id. at 327-28); (State's Exs. 28A, 28B, 28C).
 {¶ 29} The jury heard testimony from witnesses at the scene of the crime. Michael Deickert testified that Snyder is his niece, and that he can see her house from where he lives. (Tr. Vol. I. at 169, 171). Deickert testified that around *Page 17 
1:00 a.m. on August 14th he was outside moving his car when he noticed all the lights were turned on at Snyder's house. (Id. at 170-72). Deickert moved his car and noticed that the all the lights were now turned off at Snyder's house. (Id. at 172). Deickert became suspicious and called Snyder to investigate. (Id.; Id. at 191). Snyder picked up the phone and stated, "[w]ell, I'm glad you called. I need you to do something for me * * * I need you to run down to my brother's house, tell him his friend's here, he wants his money." (Id.). According to Deickert, Snyder's voice indicated urgency, and she pleaded with him to go get her brother stating, "I need you to do this for me. I don't ask you to do nothing for me, Mikey. Please do this for me." (Id.). Deickert went to get Snyder's brother, Jeremy Hutchinson, told Hutchinson about the conversation he had with Snyder, and the two of them decided to drive to her house and investigate further. (Id. at 173-75).
 {¶ 30} Deickert and Hutchinson pulled up behind Snyder's house with their vehicle's headlights turned on. (Id. at 175, 179). Shortly after they arrived, they witnessed a male walk out to where cars were parked. (Id. at 180). Deickert drove his car around to the front of Snyder's house and yelled out "[h]ey, what's up?" to the male, and the male walked back into Snyder's house. (Id.; Id. at 191). Soon thereafter, they witnessed a black male dressed in all black clothing with a ski mask come from behind the house carrying a duffle bag. (Id.; Id. at 192-94). Deickert and Hutchinson approached the black male as he was going toward a *Page 18 
Honda Civic, and the black male stated to them, "[y]ou guys got a problem?" and was reaching into the duffle bag. (Id. at 182). Deickert and Hutchinson then drove away because they thought he had a gun. (Id.).
 {¶ 31} Thereafter, Deickert and Hutchinson witnessed the black male enter the front passenger door of the parked Honda Civic. (Id. at 183). Snyder, then, came running out of the house and told them she had just been robbed. (Id. at 184). Hutchinson immediately dialed 9-1-1 on his cell phone, and the two of them decided to pursue the Honda Civic until the police were able to apprehend the suspects. (Id.); (State's Ex. 7). Deickert testified that, at first, they did not follow directly behind the car because they thought the black male had a gun. (Id.). Deickert testified that the car was running red lights and speeding, but he did not lose sight of the car. (Id. at 186). Deickert also testified that as they were chasing the car, he saw a gun thrown from the passenger side of the vehicle. (Id. at 188). Eventually, Deickert was able to point out the car to law enforcement that arrived at the chase scene, and he and Hutchinson ended their pursuit. (Id.).
 {¶ 32} On cross-examination, Deickert testified that he did not recall ever seeing a red handkerchief around the black male's neck, even though he was within ten feet of him. (Id. at 195). He also testified that it appeared that the person with the black bag jumped into the front passenger's seat. (Id. at 196, 199). Deickert admitted that there was "at least some time" where he lost sight of the vehicle, and that he could not say for sure that someone got into or out of the car *Page 19 
during the pursuit. (Tr. Vol. II at 201). On re-direct, Deickert clarified that he only lost sight of the vehicle when it was driving on a road parallel to the road on which he was driving, and he was only able to see the car when it was not behind a house as it was driving. (Id. at 202). He further clarified that he saw something around the black male's neck, but he could not tell what color it was or if it was specifically a bandana. (Id. at 203-04).
 {¶ 33} The jury heard testimony from several law enforcement officers. Marion City Police Officer Jeremy Bice testified that he has been employed as a dispatcher for the police department for six years. (Tr. Vol. II at 245-46). Bice testified that, around 1:22:32 a.m. on August 14, 2006, he received a 9-1-1 phone call from Hutchinson reporting the home invasion. (Id. at 249, 251); (State's Ex. 7). Bice testified that Patrolman Campese reported identifying the suspects' vehicle at 1:25:31 a.m., just two minutes and fifty nine seconds after the 9-1-1 call was received. (Id. at 249). Bice testified that an officer reported over the radio that a gun was thrown from the vehicle at 1:26:27 a.m., and that the suspects' vehicle was stopped at 1:27:32, just five seconds after the gun was discarded. (Id. at 250). Bice further testified that a total of five (5) minutes elapsed from receipt of the 9-1-1 call to seizure of the suspects' vehicle. (Id. at 251). The recorded 9-1-1 conversation was played for the jury and entered into evidence. (Id. at 251); (State's Ex. 7). *Page 20 
 {¶ 34} Patrolman David Troutman of the Marion City Police Department testified that he responded to the August 14, 2006 home invasion report. (Id. at 205-07). Troutman testified that he encountered the suspects' vehicle and another vehicle following behind it. (Id. at 209). When Troutman joined the pursuit, the vehicle following the suspects' vehicle pulled over so that he could pass and get behind the suspects' vehicle. (Id.). Troutman and other officers in police cruisers were able to barricade the suspects' vehicle and bring it to a stop. (Id. at 210-11). Troutman testified that Williams, Queen, and Landon exited the vehicle. (Id. at 211). Landon was the driver; Queen was in the front passenger's seat; and Williams was in the rear passenger's seat. (Id.). Troutman identified defendant Williams as the vehicle's rear passenger. (Id. at 214).
 {¶ 35} Troutman testified that he found sixty (60) pills, twenty-one (21) CDs, and $116 cash in Williams' pockets at the time of arrest. (Id. at 215, 218); (State's Exs. 31, 32, 30). Troutman testified that Snyder identified the CDs as coming from her house and belonging to Miller. (Id. at 219). Troutman confirmed Snyder's testimony concerning the amount of CDs and PlayStation® 2 games stolen. (Id. at 219-20). Troutman testified that Williams was wearing all black Dickies® clothing, a "doorag," a black hat, blue shorts, a white tank, belt, shoes, and socks. (Id. at 223). Troutman testified that it was not unseasonably cool the August evening of the arrest. (Id. at 224). Troutman further testified that an *Page 21 
unknown pill, a straw, and a balloon containing an unknown substance were found on Williams at booking. (Id. at 228).
 {¶ 36} Officer Chad Campese was employed with the Marion City Police Department and assisted with the August 14, 2006 arrest of Williams, Queen, and Landon. (Id. at 254-55). Campese testified that Officer Elliot's car was ahead of his in pursuit of the suspects' car, and Officer Elliot announced over the radio that a gun was thrown from the vehicle. (Id. at 257-58). Campese testified that he recovered and took pictures of the gun and identified it at trial. (Id. at 259-60); (State's Exs. 2, 2D-H).
 {¶ 37} Officer Mark Elliot of the Marion City Police Department testified that he was also involved in the August 14, 2006 pursuit of the silver/gray Honda Civic in which Williams, Queen, and Landon were found. (Tr. Vol. III at 554-55, 559). Elliot testified that, while in pursuit of this vehicle, he witnessed a gun thrown from the vehicle's passenger side, though he could not tell whether it was thrown by the front seat or rear seat passenger. (Id. at 560). Elliot testified that the gun recovered from the scene was loaded — "there was a round in the chamber, the hammer was cocked, and safety was off." (Id. at 562-63). Elliot also confirmed that sixty (60) pills of unknown substance were found on Williams and several rings were found in the vehicle, which were returned to the victim. (Id. at 566, 570-71); (State's Exs. 31, 28A, 28B, 28C). *Page 22 
 {¶ 38} On cross-examination, Elliot testified that the shoe print recovered from the back door to the Uncapher house matched Landon's shoes, even though Landon told police he did not kick in the door. (Id. at 577-78). Elliot also testified that Landon neglected to tell him about the knife he used and the gag used on the victim, even though he later admitted these things to Detective Ross. (Id. at 578). On re-direct, Elliot clarified that Landon's apparently contradictory stories took place during the course of one police interview. (Id. at 580).
 {¶ 39} Patrolman Shane Gosnell of the Marion City Police Department testified that he, too, was involved in the August 14, 2006 pursuit of the suspects' vehicle. (Tr. Vol. IV at 746-47). Gosnell testified that he removed a Gerber pocket knife and numerous quarters from Queen's pocket at the time of arrest. (Id. at 729); (State's Ex. 33). Gosnell also testified that Queen admitted to his involvement in the robbery and implicated Williams as well. (Id. at 751, 754). Gosnell testified that he located the following items on the vehicle's back passenger seat: a black duffle bag containing a "NCAA `06" PlayStation® 2 game, a Virgin Mobile® cell phone, a Verizon® cell phone, sunglasses, a pair of black leather gloves, a black long sleeve shirt, a Footlocker® bag with two Ohio State University hats and a Nike® t-shirt with receipt inside, a tan and green camouflage scale, a Nike® shoe box with shoes inside, and a duffle bag with medical supplies. (Id. at 757-67); (State's Exs. 17-25, 16E, 16H, 16J, 16L-N). Gosnell also located three gold rings from the rear passenger side floorboard and a black hat, brown *Page 23 
work gloves, and a butterfly knife from under the front passenger's seat. (Id. at 766-68); (State's Exs. 16L-O).
 {¶ 40} Gosnell further testified that Snyder identified the items as belonging to her. (Id. at 768). Gosnell also observed markings on Snyder's legs and her right wrist from being bound. (Id.); (State's Ex. 29). On cross-examination, Gosnell testified that he was unable to obtain any decent latent fingerprints at the house. (Id. at 779). Gosnell testified that Landon's shoe prints matched the one recovered from the house's back door, even though Landon told him that Williams kicked in the back door. (Id. at 780). Gosnell admitted that he only found $116 cash on Williams, even though the victim testified that she gave Williams $400 to $600 in cash. (Id. at 781).[6] Gosnell also testified that he was only able to locate two pairs of gloves, even though Landon testified that he, Queen, and Williams were all wearing gloves. (Id. at 783-84). Gosnell also admitted that neither Snyder nor Deickert were ever shown a line-up. (Id. at 786).
 {¶ 41} The jury heard testimony from forensic experts as well. Todd Wharton, a Bureau of Criminal Identification and Investigation (BCI) forensic scientist, testified that he examined the firearm that was thrown from the suspects' vehicle. (Tr. Vol. III at 416, 423); (State's Ex. 2). Wharton determined that the firearm was operable, but he did not observe any fingerprints on the firearm. (Id. at 424-25). Wharton explained that BCI policy requires that firearms be tested for *Page 24 
DNA, not fingerprints, because DNA testing is more successful with firearms. (Id. at 426). Wharton also examined the coaxial cable that was used to tie up the victim, but was, likewise, unable to locate any latent prints. (Id. at 427-30); (State's Ex. 12). Wharton also testified, however, that the test results do not mean that no one touched the firearm or the cable, but simply that no prints were left on those items. (Id. at 432-33). Wharton's reports were admitted into evidence. (Id. at 431); (State's Ex. 2A, 12A).
 {¶ 42} Gabriel Feltner, a BCI forensic biologist specializing in DNA testing, testified that he examined the firearm for DNA evidence. (Id. at 448-49, 457-58). Feltner testified that he obtained DNA profiles from the firearm and compared those profiles to DNA samples from Queen, Landon, Baker, and Williams; however, he did not find any matches between the firearm and the suspects. (Id. at 459, 461-62); (State's Exs. 3-6). Feltner testified that this does not mean that none of the suspects ever handled the firearm or had it in their possession. (Id. at 462-63) Feltner's reports were admitted into evidence as well. (Id. at 464); (State's Exs. 2B, 2C). On cross-examination, Feltner admitted that Williams' DNA was not found on the firearm. (Id. at 469).
 {¶ 43} Finally, the jury heard testimony from Williams. Williams testified that he had other felony convictions, including: a drug conviction, receiving stolen property, and forgery. (Tr. Vol. V at 820). According to Williams, during the afternoon hours of August 13, 2006, he was at a friend's house for a bonfire party *Page 25 
drinking and using drugs. (Id. at 821). Williams testified that he left the party to meet some friends for karaoke by driving his car, but he saw law enforcement and decided to park his car and walk to meet up with friends. (Id. at 821-22). Williams testified that he did not want to be stopped by law enforcement because he was driving without an operator's license, and he had heroin and a 750 milligram Augmentin[7] pill in his pocket. (Id. at 822). According to Williams, as he was walking to meet his friends, two white males and a black male, all dressed in dark clothing, in a gray four-door car stopped him asking for marijuana. (Id. at 823-25). Williams testified that he agreed to help the men get marijuana if they gave him a ride to the "OK Café". (Id. at 825). Williams asked the men to drop him off near a Napa Auto parts store so that he could proceed to a house on David Street to purchase marijuana. (Id. at 827). Williams was unable to get marijuana at that house, so he asked them to come back in about forty-five (45) minutes to an hour, and he would have marijuana. (Id.). Williams testified that they arrived back to pick him up between 1:00 to 1:30 a.m., but this time only the two whites guys were in the car. (Id. at 328). Williams further testified that he went into the back seat of the car and noticed some shoes, a black bag, and "[a] whole bunch of other stuff on the seat." (Id.). Williams testified that he found a bag of pills on the floorboard, which he picked up and placed in his pocket. (Id. at 829). He also *Page 26 
testified that he found several CDs on the seat and placed many of them in his pockets as well. (Id.). According to Williams, shortly after he entered the car, they were stopped by the police. (Id.). Williams admitted that the police found the pills, the CDs, and heroin in his possession, but denied ever having or seeing any firearm. (Id. at 830). Williams admitted to possession of heroin and agreed that the jury should convict him of that charge; however, he denied being involved in the home invasion. (Id. at 833).
 {¶ 44} On cross-examination, Williams admitted to first telling the police that the CDs in his possession at the time of arrest were his, but later told police that he took them from the car. (Id. at 834-35). Williams explained:
 Q: So these are CDs that what, belonged to you?
 A: CDs that belonged to me that I got out of the car.
 Q: Well, because they belonged to you because you found `em in the car and put `em in your pocket?
 A: Um-hum.
 Q: And that would, in your mind make them yours?
 A: Yes, at the time.
Williams also admitted that, at the time of arrest, he was wearing black Dickies® pants, a black t-shirt, a red bandana, with a black doorag. (Id. at 840). Williams testified that he never really intended to buy marijuana for Queen and Landon; instead, he intended to purchase it for himself. (Id. at 854). Williams also admitted to several more criminal convictions, including: deception to obtain a dangerous drug, possession of cocaine, tampering with evidence, receiving stolen *Page 27 
property, and forgery. (Id. at 855-56); (State's Exs. 37, 38). After testifying, Williams rested his defense. (Id. at 860).
 {¶ 45} At the close of the evidence, Williams was found guilty of: aggravated burglary, aggravated robbery, kidnapping, intimidation of a victim, possession of heroin, having a weapon while under disability, and the gun specifications. Williams' assignment of error addresses all these convictions, except the possession of heroin conviction. We will address each, in turn, combining our discussion where appropriate.
 {¶ 46} The criminal act of aggravated burglary is codified in R.C. 2911.11, which provides, in pertinent part:
 (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
 (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
The criminal act of aggravated robbery is codified in R.C. 2911.01, which provides, in pertinent part:
 (A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 (1) Have a deadly weapon on or about the offender's person or *Page 28 under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
 {¶ 47} The victim, Snyder, testified that after 1:00 a.m. in the morning two white males and a black male, all dressed in black, broke in her back door, entered her bedroom, and demanded money. Snyder also testified that the men tied her hands and feet behind her back, and that they had knives and a gun, which they used to threaten her life. Co-defendants Queen and Landon testified that Williams was the black male that helped them during the home invasion, and that Williams had a gun. Two independent witnesses, Barlow and Stillwell, testified that Williams helped plan the home invasion with Queen, Landon, and Baker. In addition to the testimony, Williams was found in possession of several items from Snyder's house and dressed in all black Dickies® clothing that matched that worn by his co-defendants. Accordingly, we find that Williams' aggravated burglary and aggravated robbery convictions were not against the manifest weight of the evidence.
 {¶ 48} The criminal act of kidnapping is codified in R.C. 2905.01, which provides, in pertinent part:
 (A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
 (1) To hold for ransom, or as a shield or hostage; *Page 29 
The criminal act of intimidation of a victim or witness is codified in R.C. 2921.04, which provides, in pertinent part:
 (B) No person, knowingly and by force or by unlawful threat of harm to any person or property, shall attempt to influence, intimidate, or hinder the victim of a crime in the filing or prosecution of criminal charges or an attorney or witness involved in a criminal action or proceeding in the discharge of the duties of the attorney or witness.
 {¶ 49} Snyder testified that the men removed her from her bedroom at gun-point, placed her on a couch, bound her hands and feet behind her back, and demanded that she give them money. When she could not produce any money from the house, they demanded that she call other people for money, and threatened to take her life. Co-defendants Queen and Landon confirmed Snyder's testimony. Finally, Snyder testified that the men threatened to kill the twelve year old boy in her care and her if she called the police. Accordingly, we find that Williams' convictions for kidnapping and intimidation of a victim/witness are not against the manifest weight of the evidence.
 {¶ 50} The criminal act of having a firearm while under a disability is codified in R.C. 2923.13, which provides, in pertinent part:
 (A) * * * no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
 * * *
 (3) The person * * * has been convicted of any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse * * *. *Page 30 
Snyder, Landon, and Queen all testified that Williams possessed a firearm during the commission of the robbery, burglary, intimidation of a victim, and kidnapping. Furthermore, the police recovered a gun, which Deickert testified was thrown from the passenger side of the fleeing vehicle — the same side on which Williams was seated. A BCI expert testified that the firearm recovered by the police was fully operable. The State also presented into the record certified copies of Williams' previous convictions for illegal possession of drugs. Accordingly, Williams' conviction for possession of a firearm while under a disability was not against the manifest weight of the evidence. Similarly, we cannot conclude, based upon the foregoing, that Williams' gun specification convictions were against the manifest weight of the evidence.
 {¶ 51} For all these reasons, Williams' fourth assignment of error is overruled.
 ASSIGNMENT OF ERROR NO. I THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY NOT PERMITTING THE CROSS-EXAMINATION OF APPELLEE'S WITNESS CONCERNING HER INABILITY TO REMEMBER.
 {¶ 52} In his first assignment of error, Williams argues that the trial court erred by not permitting cross-examination of Niki Barlow concerning her inability to remember. Specifically, Williams argues that he should have been permitted to cross-examine Barlow regarding pending child abuse/neglect and felony theft *Page 31 
charges filed against her pursuant to Evid. R. 616(B) because the pending charges affected her ability to remember. The State, on the other hand, argues that prior convictions, and not pending charges, are the proper vehicles by which to impeach a witness pursuant to Evid. R. 609. The State also argues that Williams was not prejudiced by his inability to impeach Barlow because Barlow admitted that her memory was faulty; and therefore he cannot show plain error. We agree with the State that Williams has failed to show plain error.
 {¶ 53} Since Williams failed to object at trial, we review for plain error. Crim. R. 52(B); State v. Long (1978), 53 Ohio St.2d 91, 97,372 N.E.2d 804. We recognize plain error "`with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" State v. Landrum (1990), 53 Ohio St.3d 107, 110,559 N.E.2d 710, quoting Long, 53 Ohio St.2d 91, paragraph three of the syllabus. For plain error to apply, the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceeding, and the error must have affected a substantial right.State v. Barnes (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240. Under the plain error standard, the appellant must demonstrate that the outcome of his trial would clearly have been different but for the trial court's errors. State v. Waddell (1996), 75 Ohio St.3d 163, 166,661 N.E.2d 1043, citing State v. Moreland (1990), 50 Ohio St.3d 58, 63,552 N.E.2d 894. *Page 32 
 {¶ 54} Williams has failed to demonstrate plain error. To begin with, Williams has not demonstrated that the outcome would have been different had he been able to cross examine Barlow using her pending charges. Furthermore, Barlow testified at length concerning her inability to remember and openly admitted that her memory was faulty. Barlow testified:
Q: [Y]ou don't recall much about August 13th and14th either, do you?
 A: It's been a year, almost a year and a half ago, and I have other things going on in my life that's more important to me. I try to block it out because it really wasn't that important to me, but — there are some things I do not remember, no.
 * * *
 Q: Before you testified today had you gone over anything to help you remember —
 A: Yes.
 Q: — what happened?
 A: I went to Jim Slagle's office and watched a video.
 Q: Because you had told me you don't remember, isn't that correct?
 A: I don't remember some of it, yes. But-
 Q: And that was because of things in your life?
 A: Yes.
(Tr. Vol. II at 391, 399). Since Barlow readily admitted her faulty memory, we fail to how Williams suffered prejudice by the trial court's ruling; and therefore, we fail to see manifest injustice that would merit finding plain error.
 {¶ 55} Williams' first assignment of error is, therefore, overruled.
 ASSIGNMENT OF ERROR NO. II THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN IT ALLOWED APPELLEE TO PLAY INTERVIEWS OF APPELLEE'S WITNESSES. *Page 33 
 {¶ 56} In his second assignment of error, Williams argues that the trial court erred when it permitted the State to play the police interviews of Queen, Criswell, and Barlow. Specifically, Williams argues that he never impeached these witnesses on the basis of inconsistent statements, which would have allowed the interviews to be admitted as prior consistent statements. Furthermore, Williams argues that the admission of the entire interviews was prejudicial because they contained additional evidence not presented by these witnesses' testimony.
 {¶ 57} The State, on the other hand, argues that Williams, by implying inconsistencies between trial testimony and initial police interview statements and implying self-serving fabrications, opened the door to this evidence under Evid. R. 801(D)(1)(b). The State further argues that Williams failed to object to the playing of the entire video or suggest redactions and, consequently, waived this argument on appeal. We agree with the State.
 {¶ 58} Evid. R. 801(D)(1)(b) provides:
 (D) Statements which are not hearsay. A statement is not hearsay if:
 (1) Prior statement by witness. The declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * (b) consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive * * *. *Page 34 
 {¶ 59} Queen, Criswell, and Barlow all testified at trial about the events of August 13-14, 2006 and their subsequent police interviews. (Tr. Vol. IV at 644, 672, 687); (Tr. Vol. III at 526, 536, 547); (Tr. Vol. II at 362, 388; Tr. Vol. IV at 405). Furthermore, all three were subject to cross-examination concerning the statements they made to law enforcement. Finally, each of these witnesses was questioned at length about whether they fabricated their testimony or whether they were improperly influenced or had improper motives.
 {¶ 60} During cross-examination, Williams' counsel implied that Queen was fabricating his story so that he could be released from prison early. (Tr. Vol. IV at 682). Williams' counsel alleged that Criswell was improperly influenced by law enforcement officers to state that Williams had a gun. (Tr. Vol. III at 548-49). Counsel for co-defendant Baker also implied that Criswell fabricated his story to avoid imprisonment on a pending probation violation. (Id. at 537-38). Williams' counsel implied that Barlow fabricated her testimony to gain favor with the State on pending charges she was facing as well. (Tr. Vol. III at 405-409). Accordingly, the trial court did not err by allowing the State to play the police interviews of these witnesses at trial because the State offered them to rebut the charges of recent fabrication or improper motives pursuant to Evid. R. 801(D)(1)(b).
 {¶ 61} Furthermore, Williams' argument that the interviews should have been redacted because they contained additional evidence is without merit factually and legally. Factually, the interviews were consistent with the testimony *Page 35 
offered by these witnesses at trial. Legally, Williams failed to object on this basis at trial; and therefore, has waived this argument on appeal. See State v. Davis, 2d Dist. No. 20709, 2005-Ohio-5783, ¶¶ 17-27.
 {¶ 62} Williams' second assignment of error is, therefore, overruled.
 ASSIGNMENT OF ERROR NO. III THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN IT PRECLUDED A LETTER WRITTEN BY AN ALLEGED ACCOMPLICE OF APPELLANT WHICH WOULD HAVE SIGNIFICANTLY AFFECTED THE CREDIBILITY OF THE ALLEGED ACCOMPLICE.
 {¶ 63} In his third assignment of error, Williams argues that the trial court erred when it excluded from evidence a letter written by Queen, which indicated that co-defendant Baker was not involved in the home invasion. Williams argues that the admission of this letter into evidence was critical because it would have impeached Queen's testimony on the basis of credibility. Williams further argues that the trial court should have, at a minimum, allowed cross-examination of Queen on the basis of the letter, but the court precluded any use of the letter.
 {¶ 64} The State argues that the trial court did not err in excluding the letter because defense counsel failed to provide the State discovery of the letter. Furthermore, the State argues that the exclusion of the letter from evidence did not prejudice Williams since the letter dealt with co-defendant Baker. The State also contends that Williams did not attempt to cross-examine Queen on the basis of the letter nor did Williams object on this basis; and therefore, Williams has waived *Page 36 
this argument. We agree with the State that the trial court did not err in excluding the letter from evidence.
 {¶ 65} Crim. R. 16(E) provides various sanctions a trial court may impose for discovery violations. Subsection (3) provides:
 (3) Failure to comply. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.
(Emphasis added). We review a trial court's Crim. R. 16(E)(3) discovery sanction under an abuse of discretion standard. State v. Parson (1983),6 Ohio St.3d 442, 445, 453 N.E.2d 689. An abuse of discretion suggests that a decision is unreasonable, arbitrary, or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.
 {¶ 66} In this case, the Queen letter was first brought to the State's attention during co-defendant Baker's cross-examination of Queen. (Tr. Vol. IV at 691-92). Baker's counsel admitted that he was in possession of the letter for approximately one month before trial but failed to disclose it to the State. (Id. at 693). Counsel also admitted that he obtained the letter from Baker, though he was not sure how Baker came to possess it. (Id. at 694, 699). Under these circumstances, we cannot conclude that the trial court abused its discretion by excluding the letter from evidence as a discovery sanction. *Page 37 
 {¶ 67} Williams' third assignment of error is, therefore, overruled.
 ASSIGNMENT OF ERROR NO. V APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL.
 {¶ 68} In his fifth assignment of error, Williams argues that he was denied effective assistance of trial counsel because counsel: (1) failed to object to the trial court's exclusion of testimony concerning Barlow's pending charges; (2) failed to object to the State's bolstering of Deickert's testimony by asking if he had a prior criminal record; (3) failed to object to hearsay statements offered by Deickert and Patrolman Elliot; (4) failed to object when Queen testified concerning whether Landon had ever been to the Uncapher Avenue address before; and (5) failed to mention in closing argument significant evidence that corroborated Williams' testimony that he was picked up by Queen and Landon after the home invasion. The State, however, contends that many of these alleged counsel errors are not errors at all, and, furthermore, if they are errors, they are insufficient to find ineffective assistance of counsel. We agree with the State.
 {¶ 69} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. State v. Kole (2001), 92 Ohio St.3d 303, 306,750 N.E.2d 148, citing Strickland v. Washington (1984), 466 U.S. 668,687, 104 S.Ct. 2052, 80 L.Ed.2d 674. In order to show counsel's conduct was deficient or unreasonable, the defendant must *Page 38 
overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. Strickland, 466 U.S. at 687. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. State v.Sallie (1998), 81 Ohio St.3d 673, 675, 693 N.E.2d 267. Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. State v. Carter (1995),72 Ohio St.3d 545, 558, 651 N.E.2d 965. Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. See State v. Bradley (1989), 42 Ohio St.3d 136, 141-42, 538 N.E.2d 373, quoting State v. Lytle (1976), 48 Ohio St.2d 391, 396, 358 N.E.2d 623.
 {¶ 70} Williams alleges that his trial counsel was ineffective for failing to object to various testimony offered at trial. Trial counsel's failure to object at trial, however, is generally a tactical or strategic decision; and therefore, does not generally constitute ineffective assistance. State v. Wilson, 3d Dist. No. 14-06-19,2006-Ohio-6930, ¶ 49, citing State v. Lockett (1976), 49 Ohio St.2d 48,558 N.E.2d 1062, paragraph nine of the syllabus, reversed in part byLockett v. Ohio (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973. Williams' trial counsel aggressively represented him by thoroughly cross-examining the State's witnesses and presenting his testimony. Williams' allegation regarding closing arguments is also without merit because the manner and content of closing arguments are trial *Page 39 
strategies; and therefore, do not constitute ineffective assistance. SeeState v. Smith, 9th Dist. No. 23542, 2007-Ohio-5119, ¶ 18; State v.Poole, 8th Dist. No. 80150, 2002-Ohio-5065, ¶ 22; Carter,72 Ohio St.3d at 558.
 {¶ 71} Furthermore, we are not persuaded that Williams has suffered prejudice by his trial counsel's performance given the overwhelming evidence presented against him. Under these circumstances we cannot conclude that Williams was denied effective assistance of trial counsel.
 {¶ 72} Williams' fifth assignment of error is, therefore, overruled.
 ASSIGNMENT OF ERROR NO. VI THE TRIAL COURT ABUSED ITS DISCRETION IN GIVING APPELLANT A TWENTY-FOUR YEAR SENTENCE.
 {¶ 73} In his sixth and final assignment of error, Williams argues that the trial court abused its discretion by sentencing him to a twenty-four (24) year term of imprisonment. Specifically, Williams argues that the trial court should not have imposed maximum sentences as to counts one, two, and three because: (1) the victim and the twelve-year old boy present sustained no physical injury; (2) no sexual activity took place; (3) the victim's liberty was restrained for less than an hour; (4) the victim was not used as a human shield; (5) the gun was never discharged; and (6) his prior convictions were all non-violent felonies.
 {¶ 74} The State, however, argues that the trial court gave Williams significantly less than the maximum term of imprisonment for all his convictions. According to the State, Williams faced a total possible sentence of forty-four (44) *Page 40 
years, but the trial court only imposed twenty-four (24) years — a little more than half the possible maximum. The State argues that the trial court viewed the pre-sentence investigation (PSI) report and considered various aggravating factors, such as: (1) Williams' six prior felony convictions and imprisonment on three separate occasions; (2) a loaded firearm and two knives were used; (3) the victim was bound; (4) the victim's life was threatened; (4) Williams involved two younger men — eighteen-year olds — in committing these crimes; and (5) Williams was the home invasion "ringleader" directing co-defendants Queen and Landon. Under these circumstances, the State argues that the trial court did not abuse its discretion by sentencing Williams to twenty-four (24) years imprisonment. We agree.
 {¶ 75} A trial court's sentence will not be disturbed on appeal absent a defendant's showing by clear and convincing evidence that the sentence is unsupported by the record; the sentencing statutes' procedure was not followed or there was not a sufficient basis for the imposition of a prison term; or that the sentence is contrary to law. State v.Tyson, 3d Dist. Nos. 1-04-38; 1-04-39, 2005-Ohio-1082, ¶ 19, citing R.C. 2953.08(G); State v. Ramos, 3d Dist. No. 4-06-24, 2007-Ohio-767,¶ 23 (the clear and convincing evidence standard of review set forth under R.C. 2953.08(G)(2) remains viable with respect to those cases *Page 41 
appealed under the applicable provisions of R.C. 2953.08(A), (B), and (C) * * *);[8] State v. Rhodes, 12th Dist. No. CA2005-10-426,2006-Ohio-2401, ¶ 4. Clear and convincing evidence is that "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford (1954), 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus; State v.Boshko (2000), 139 Ohio App.3d 827, 835, 745 N.E.2d 1111. An appellate court should not, however, substitute its judgment for that of the trial court because the trial court is `"clearly in the better position to judge the defendant's likelihood of recidivism and to ascertain the effect of the crimes on the victims."' State v. Watkins, 3d Dist. No. 2-04-08, 2004-Ohio-4809, ¶ 16, quoting State v. Jones (2001),93 Ohio St.3d 391, 400, 754 N.E.2d 1252.
 {¶ 76} In its sentencing entry, the trial court stated: "[t]he Court has considered the record, oral statements, any victim impact statement and pre-sentence report prepared, as well as the principles and purposes of sentencing under R.C. 2929.11, and the appropriate factors under R.C. 2929.12." (Nov. 16, 2007 JE at 1). Both the prosecutor and defense counsel made statements at sentencing, but the victim and Williams did not make statements. (Nov. 14, 2007 Tr. at 1004, 1007, 1013). At no time did Williams accept responsibility or express *Page 42 
remorse for his actions. (Nov. 14, 2007 Tr.); (Oct. 29, 2007 PSI).
 {¶ 77} The trial court's sentence comports with the overall purposes of sentencing, which are: (1) to protect the public from future harm from the offender and others; and (2) to punish the offender. R.C. 2929.11(A). With regard to the first purpose, Williams had an extensive criminal history, which included convictions for: possession of cocaine, receiving stolen property, forgery, deception to obtain a dangerous drug, possession of cocaine, tampering with evidence, criminal mischief, criminal trespass, theft, along with multiple traffic violations. (Oct. 29, 2007 PSI). In fact, Williams' criminal record extends over almost twenty years and three States. (Id.). Williams was incarcerated or jailed over ten times. (Id.). With regard to the second purpose, Williams broke into Snyder's home, threatened her life and a twelve-year old boy's life, ordered that Snyder's hands and feet be bound behind her back, demanded money, ransacked her home, and violated not only her personal security but her human dignity. Under these circumstances, the trial court's imposition of a twenty-four (24) year sentence was appropriate.
 {¶ 78} We are also not persuaded by Williams' argument that the offense was non-violent because: Snyder was not physically harmed or sexually assaulted; the firearm was never discharged; and Snyder's liberty was restrained for less than one hour. These assertions lack merit and, quite frankly, are disingenuous. Snyder sustained lacerations and bruising on her arms and legs from being bound *Page 43 
with cables. The firearm, though not discharged, was pointed at Snyder's face and used to threaten her life. Furthermore, if these alleged mitigating factors had occurred, Williams would have faced additional charges so we find his argument less than persuasive.
 {¶ 79} Having reviewed the entire record in this case, including the sentencing hearing, the judgment of sentence, and the PSI, we find that Williams has failed to clearly and convincingly demonstrate that his sentence was unsupported by the record.
 {¶ 80} Williams' sixth assignment of error is, therefore, overruled.
 {¶ 81} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment Affirmed.
SHAW, P.J. and ROGERS, J., concur.
[1] Baker was also known as "Rah-Rah." (Mar. 10, 2008 Tr. Vol. II at 476).
[2] All transcript references hereinafter are to the Sept. 24-27, 2007 trial transcript. From this point forward, we will omit the date and refer to it as "Tr. Vol. # at pg."
[3] According to Stillwell, a "lick" is a "quick way to get money * * * [l]ike stealing it, robbing, whatever * * *." (Tr. Vol. III at 530-31). This may also be referred to as "hitting a lick." (Id. at 531).
[4] Snyder testified that Cheyenne was Miller's sister. (Tr. Vol. II at 320).
[5] OxyCotin is a brand name of oxycodone. Oxycodone is "[a] medicinal substance used as a narcotic and analgesic (to relieve pain)." 4 Schmidt, M.D., Attorneys' Dictionary of Medicine (Matthew Bender Co., Inc. 2004) O-148.
[6] It should also be noted that the State, in fact, stipulated that only $116 cash was found on Williams, and that police did not find $400 to $600 in the vehicle either. (Tr. Vol. II at 341-42; Tr. Vol. IV at 781).
[7] Augmentin is "[t]he trade name of a prescription containing amoxicillin (a penicillinase-sensitive penicillin) and clavulanic acid (a beta-lactamase inhibitor). 1 Schmidt, M.D., Attorneys' Dictionary of Medicine (Matthew Bender Co., Inc. 2004) A-622.
[8] This Court notes that on May 21, 2008, the Ohio Supreme Court heard oral arguments in the case of State v. Kalish (Ohio Supreme Court Case No. 2007-1703) on the issue of whether a clear and convincing or abuse of discretion standard is the proper standard of review to be applied by an appellate court when reviewing a sentence. Although we have applied the clear and convincing evidence standard in this case, we note that the same conclusion would have been reached applying an abuse of discretion standard. *Page 1