OPINION *Page 2 
{¶ 1} Defendant-appellant, Lloyd D. Turks (hereinafter "Turks"), appeals the Allen County Court of Common Pleas judgment of conviction on one count of felonious assault. For the reasons that follow, we affirm.
 {¶ 2} On or about June 14-15, 2007, Tamiko Turks (hereinafter "Tamiko"), Turks' estranged wife, was taken to St. Rita's Hospital in Lima, Ohio after sustaining a severe neck injury. Tamiko's injury left her a quadriplegic. Following an investigation, the Lima Police Department suspected that Turks caused Tamiko's injury, and that the injury was not accidental.
 {¶ 3} On September 13, 2007, the Allen County Grand Jury indicted Turks on one count of felonious assault in violation of R.C. 2903.11(A)(1), a second degree felony. (Doc. No. 1).
 {¶ 4} On September 21, 2007, Turks entered a plea of not guilty.
 {¶ 5} On April 29-30, 2008, a jury trial was held, and Turks was found guilty as charged in the indictment. Turks, however, failed to return to court for the rendering of the verdict, so the trial court entered the conviction in Turks' absence and issued a warrant for his arrest. (April 29-30, 2008 Tr. at 147-54).
 {¶ 6} On June 18, 2008, Turks was arrested, and, on June 25, 2008, Turks was sentenced to eight (8) years imprisonment. (Doc. No. 81). *Page 3 
 {¶ 7} On July 23, 2008, Turks filed this present appeal and now asserts two assignments of error for our review. (Doc. No. 92). We will address Turks' assignments of error out of the order they appear in his brief.
 ASSIGNMENT OF ERROR NO. II THE DEFENDANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THEEVIDENCE.
 {¶ 8} In his second assignment of error, Turks argues that his conviction is against the manifest weight of the evidence. Specifically, Turks argues that the State failed to offer medical or eyewitness evidence, and that the State's case rested on hearsay statements. The State, on the other hand, argues that the evidence demonstrated that: Tamiko suffered a spinal injury that left her a quadriplegic; that Turks was the only person present at the time of the injury; that Turks lied to the police about how the injury occurred; and that Tamiko previously stated on several occasions that Turks picked her up and threw her to the ground head-first causing the injuries. We agree with the State that Turks' conviction was not against the manifest weight of the evidence.
 {¶ 9} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "`[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the *Page 4 
conviction must be reversed and a new trial ordered.'" State v.Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. State v. DeHass (1967), 10 Ohio St.2d 230,231, 227 N.E.2d 212.
 {¶ 10} The State presented six witnesses at trial. Berth Reeder testified that Tamiko Turks is her daughter and Lloyd Turks is her son-in-law. (April 29-30, 2008 Tr. at 25). Reeder testified that Tamiko's relationship with Turks was plagued by domestic violence and police involvement. (Id. at 26). As to the events of June 14, 2007, Reeder testified that, at that time, Tamiko and Turks were not living together and had split up. (Id. at 26-27). According to Reeder, Tamiko was done with the marriage and very afraid of Turks. (Id. at 27).
 {¶ 11} Reeder further testified that, around 9:50 p.m. on June 14, 2007, Tamiko came to her home, and she asked if Tamiko could take her for a ride. (Id. at 27-28). Tamiko agreed, so the two went to a Lima bar called Stormy's. (Id. at 28). After they had one drink, Tamiko asked Reeder if she would go to the bank with her so she could clock out from work. (Id. at 28). Reeder testified that Tamiko wanted her to go with her because she feared that Turks was stalking her, like he had done in the past. (Id.). Reeder also testified that Turks called Tamiko *Page 5 
several times while they were at Stormy's, and that the last time he called he was outside the bar. (Id. at 29). The two walked to the bank; Tamiko clocked out; and they returned to Stormy's for another drink. (Id. at 29-30). According to Reeder, they had just ordered their second drink when Turks called Tamiko again, and Tamiko insisted that they leave immediately. (Id. at 30).
 {¶ 12} Reeder testified that they drove to Angela and Keith's house on South Elizabeth Street in Lima, Ohio. (Id.). Reeder testified that they went into the house and conversed with Angela and Keith. (Id. at 31). Reeder then talked to a woman next door named "Peaches" about some money she owed her for styling her daughter's hair. (Id.). Tamiko, then, left the residence for about forty-five (45) minutes to talk with Peaches herself. (Id. at 32). Approximately ten to fifteen (10-15) minutes after Tamiko returned, Reeder's nephew, John Manley, and Willie Dukes came to the house, along with Turks. (Id. at 32-33).
 {¶ 13} Reeder testified that John and Tamiko, who was nicknamed "Mickie," started "hugging and talking and they was playing, like they always do, wrestling with each other." (Id. at 32). Then, John told Tamiko, "[w]ell, your husband came here to talk to you," and that he brought Turks over to talk with her. (Id. at 33). Turks walked through the doorway onto the back porch, and John told Tamiko to go outside and talk with Turks. (Id.). Reeder testified that Tamiko was *Page 6 
not eager to go outside onto the porch, and that John pushed her out of the house. (Id.).
 {¶ 14} Reeder testified that approximately five or six (5 or 6) seconds later, she heard Tamiko scream. (Id. at 34). Reeder testified that she thought she heard Tamiko yelling "Mom, mom," so they opened the door and ran out to see what happened. (Id.). According to Reeder, when she ran out she saw Turks squatting at Tamiko's left side, yanking her arm and yelling, "Get up, Mickie. Get up, Mickie," but that Tamiko's body was limp and just fell back down. (Id.). Reeder testified that she ran over and pushed Turks out of the way because she thought he might be beating Tamiko. (Id. at 35). She then started hitting him, asking him what he did to Tamiko, but Turks denied doing anything. (Id.). Turks and John then picked Tamiko up, put her into a van, and took her to St. Rita's Hospital. (Id. at 36).
 {¶ 15} According to Reeder, Tamiko was taken by life-flight to Toledo from St. Rita's, and they determined that her neck was broken at two places and her spinal cord was almost severed. (Id.). Reeder testified that Tamiko was hospitalized in Toledo for approximately three months, then went to Triumph, and then to Cleveland. (Id. at 37). Reeder testified that Tamiko has five children, four of which are Turks,' ages six, five, four, and three, and they all live with her now. (Id. at 37-38). Reeder testified that she talked with Tamiko about what happened *Page 7 
that night, and Tamiko told her that Turks picked her up and threw her down. (Id. at 38).
 {¶ 16} On cross-examination, Reeder testified that she had witnessed Turks hit Tamiko in the past. (Id. at 39). Reeder testified that she did not stop John from pushing Tamiko outside, though she did tell him to leave her alone. (Id. at 43-44). Reeder testified that she told John that "[Tamiko] don't want to go. Don't make her go out there," but that Tamiko was an adult and she did not feel as though she could stop her. (Id. at 45). Reeder admitted that she did not witness Tamiko's injury occur. (Id. at 46). She also admitted that it was possible that Tamiko left the porch, and that she did not know whether Tamiko was thrown off the porch. (Id.). Reeder further testified that she showed law enforcement where she found Tamiko lying following the injury. (Id. at 49).
 {¶ 17} On re-direct, Reeder testified that she talked with Tamiko about the incident approximately three weeks later, after Tamiko was no longer sedated. (Id. at 49-50). Reeder testified about that conversation as follows:
 That's what she had told me, that [Turks] picked her up and threw her down. She said that she was trying to run towards the pavement. When she left off the porch she said he wouldn't move away from in front of the door. She left off the porch running. She went to try — she attempted to go to the car. * * * So, she said that she turned this away because she figured out that she didn't have her keys. Her keys were still in her purse that I had in the house with me. So, she knew she couldn't get in the car because the car was locked. So, she was on her way to Peaches['] house basically to see if she could get help there. She *Page 8 couldn't get back in the door. He wouldn't let her get back up to the door to get in. Every time she got ready to go that way he blocked the door, I guess. That's what she was telling me. So, by the time she made it out across the yard, well, she said that she had made it on the pavement. She said she made it maybe two or three feet, the steps that she had got over there, and he pulled her from the back, pulled her shirt. He was grabbing on her. But I guess eventually he got a hold of her arms because she had her arms back like this and that's how she showed you. Well, she showed me that. She also showed the detective that, too, when I went with him up to the hospital. She said he grabbed her and picked her up from her side with one hand holding this way and another one holding this way because, well, she's just a hundred and twenty pounds and that's not a whole lot of weight, and he picked her up and threw her down. Q: Flipped her over and threw her down? A: When I asked her she didn't know exactly if she was flipped, I mean, if he twisted her around in the air or whatever. She just knows she ended up from in the air to the ground.
(Id. at 50-51).
 {¶ 18} The victim, Tamiko, also testified at trial. Tamiko testified that she was twenty-six years old and has five children. (Id. at 56). She testified that she has been married to Turks for two years, but that they were a couple for seven years. (Id.). Tamiko admitted that the relationship was abusive and that the police had been called to their house a number of times. (Id. at 57). Tamiko testified that in June of 2007 she and Turks were not together as a couple. (Id.).
 {¶ 19} Tamiko further testified that, on the night of June 14, 2007, she left work, picked up her mom, went to the bar, and afterwards went to Angie's. (Id. at *Page 9 
58). Tamiko also testified that Turks was calling her while she was at the bar with her mom. (Id. at 58-59). Thereafter, Tamiko testified as follows:
 Q: He was calling you? Okay. Now when you were at Angie's, well, there's been some testimony that John and Floyd (sic) came there, or John and Lloyd, excuse me, came there and that Lloyd went out on the back porch and then John encouraged you to go on the back porch. Do you remember that?
 A: Yea.
 Q: Pardon?
 A: Yea.
 Q: Okay. What happened when you went out? Was it just you and Lloyd on the back porch?
 A: Yep.
 Q: You said `yep'?
 A: Uh-huh.
 Q: Okay. Tell me, if you will, what you remember happened when you went on the back porch.
 A: Running.
 Q: Pardon?
 A: Running.
 Q: I can't hear you.
 A: Running.
 Q: When you were on the back porch what happened first?
 A: We was just out there not long and then I remember running.
 Q: And you remember what?
 A: Running.
 Q: Running? Running from him?
 A: Yea.
 Q: Running — you were afraid of him? You were afraid he was going to hurt you?
 A: He would have when I was running.
 Q: What do you remember?
 A: Nothing after that.
 Q: Now, do you remember talking to me out here in the hall a few minutes ago? *Page 10 
 A: Yea.
 Q: Do you remember telling me out there that you were running and he caught you from behind and grabbed you and that's the last thing you remember?
 A: Yea, I remember saying running and I remember you telling me him catching me from behind.
(Id. at 59-60). At this point, the prosecutor approached the bench with defense counsel present and suggested that he was surprised about Tamiko's testimony and asked to cross-examine her. (Id. at 61). Defense counsel suggested that she was going to cross-examine Tamiko regarding statements made to her by Tamiko as well. (Id.). The Court asked if defense counsel had any objection to the prosecution cross-examining Tamiko, and defense counsel stated `no'. (Id. at 61-62).
 {¶ 20} The prosecutor, then, cross-examined Tamiko as follows:
 Q: Do you remember talking to me in the hospital about two months ago when this case was set to go to trial and when you weren't allowed to get out of the hospital? Do you remember that?
 A: Yea.
 Q: Do you remember telling me back then that you were running from Lloyd and that he caught up with you and he picked you up from behind and held you up and threw you down? Do you remember saying that?
 A: No.
 Q: You don't remember that? Do you remember talking to this detective, this one right here? Do you see this fellow? Do you remember talking to him when you were in the hospital?
 A: I think so.
 Q: Do you remember telling him the same thing? Do you remember telling him that you went off the porch and out in the yard and you became afraid of him and you were going to run first to your car and then you were going to run, I believe, to *Page 11 Peaches house, but that he caught you, he grabbed you from behind and he threw you down? Do you remember telling him that?
 A: No.
 Q: What did you tell him?
 A: I don't know. I wasn't talking to him.
 Q: You don't remember talking to Detective Stechschulte?
 A: No.
 Q: You don't remember talking to him? You don't remember telling another detective the same thing?
 A: No.
 Q: Now, when we were getting ready for the other trial, when you were too ill to come, you were willing to talk to me. You were very pleasant. Do you remember that?
 A: Yea.
 Q: Now, when I come to talk to you last week you refused to talk to me. You wouldn't let me in the room. Why is that?
 A: `Cause I didn't want to talk.
 Q: Is it because you're having some problems with your living arrangements and you think perhaps that somebody is going to put you in a rest home, a nursing home, and you don't want to go?
 A: No.
 Q: Pardon?
 A: No.
 Q: You're not worried about that?
 A: No.
 Q: And you're not worried about your children and what's
 going to happen to the children?
 A: Yes.
 Q: You're worried about that? Is that why you're worried about telling the truth about what he did to you? You're worried for the children's future if something happens to him? Is that why you've changed from the first time we talked until now? I mean, if it is, I can understand that if you're worried about that.
 A: I'm worried about my kids, but I didn't change nothing.
 Q: Pardon? *Page 12 
 A: I'm worried about my kids, but I didn't change nothing.
 Q: Was there anybody else out there that night that could have done this to you besides him? There wasn't anybody there; was there?
 A: No.
 Q: He was the only one?
 A: Yes.
 Q: And you were running from him?
 A: Yes.
(Id. at 62-64). Thereafter, defense counsel cross-examined Tamiko as follows:
 Q: * * * Did you at any point tell your mother that Lloyd was chasing you, that he chased you from the porch and he picked you up and threw you down?
 A: I probably did.
 Q: Was that a truthful statement?
 A: I wasn't sure.
 Q: Prior to making this statement had anybody told you what they thought happened to you?
 A: Yea.
 Q: And who was that?
 A: A lot of people in the family.
 Q: And what were they telling you basically?
 A: Well, they was asking me what happened, and that this could have happened, and that could have happened. I would say `yea'; but, at the time I wasn't really sure.
 Q: So, when you made that statement you weren't sure whether it was truthful or not?
 A: No.
 Q: Do you remember last Thursday and Friday and as recently as yesterday you calling me from the hospital?
 A: Yea.
 Q: What did you tell me happened?
 A: I didn't remember.
 Q: And was that a truthful statement?
 A: Yea.
 Q: And as you sit here today do you know what actually happened that night? *Page 13 
 A: No. I remember running.
 Q: And when you say running, do you know for sure whether you were actually running from Lloyd?
 A: Yea.
 Q: You were running from him?
 A: Yea.
 Q: Were you running on the porch or on the ground?
 A: On the ground.
 Q: Okay. But you don't remember him grabbing you?
 A: No.
 Q: And you don't remember him throwing you down?
 A: No.
 Q: Is it possible that maybe you might have tripped or something?
 A: I don't know.
 * * *
 Q: Okay. You said that you called to ask [Turks] what happened that night? Did he tell you what happened? A: He told me a few different things. Q: What did he tell you?
 A: The first time he told me that John did it — he pushed me, he said. Then he told me that I fell, or tripped, over the porch.
 * * *
 Q: When you told your mother, or when you said that you probably told your mother that Lloyd threw you to the ground, are you still saying that's true today? Do you know that that's true? A: No.
(Id. at 65-69). On re-direct, the prosecutor examined Tamiko as follows:
 Q: Tamiko, you said that Lloyd told you two reasons, or, two things that happened. First of all, he said that your cousin, John, did it. Is that what you said?
 A: Yea.
 Q: Then he said after that that you fell over the porch rail?
 A: Yea.
 Q: Now, you know that's not true; don't you?
 A: Yea. *Page 14 
 Q: Now do you remember in the hospital I asked you the same question about why in the world you called him. You told me you called him. Do you remember telling me that?
 A: Yea.
 Q: Do you remember telling me that you called him to ask him `why did you do this to me'? Do you remember that?
 A: Yea.
(Id. at 69-70).
 {¶ 21} Sean Niedemire, a Lima Police Officer for the previous eight years, testified that he investigated the June 14-15, 2007 incident at 672 South Elizabeth Street. (Id. at 73). Niedemire testified that he was called to St. Rita's Hospital to investigate Tamiko's injury. (Id. at 74). Niedemire testified that Turks told him that: Tamiko was wrestling in the backyard with a cousin, whose name he didn't know; she had an asthma attack; she walked up onto the back porch of the residence and sat on the top rail; he was trying to talk to her and she fell off the railing. (Id.). Niedemire also testified that Turks told him that he did not move Tamiko after she fell. (Id. at 75). Niedemire further testified that he was familiar with Turks because he has responded to the Turks' residence several times for fights between Tamiko and Turks. (Id.). Niedemire testified that he told Tamiko that she needed to file domestic violence charges against Turks in the past, but that she never followed through with charges. (Id.). On cross-examination, Niedemire testified that he was not aware of any time that he was dispatched to the Turks' residence when the defendant was the victim. (Id. at 76). *Page 15 
 {¶ 22} Angela Johnson testified that she lived at 672 South Elizabeth Street on June 14-15, 2007. (Id. at 77). Johnson testified that she knew Tamiko through her step-son, and that she used to come visit her "every blue moon." (Id. at 79). However, four or five days prior to the incident, Tamiko was coming over to her house more frequently because she was scared of Turks, according to Johnson. (Id.). Johnson testified that Tamiko was afraid of Turks because they were breaking up and that Turks might do something about that situation. (Id. at 79-80). Johnson also identified several of the State's exhibits as pictures of her residence at 672 South Elizabeth Street. (State's Exs. 1-3).
 {¶ 23} Johnson testified that, around 11:30 p.m. to 12:00 a.m. on June 14-15, 2007, Tamiko and her mom came over to her residence. (Id. at 84). The two came in and sat at the kitchen table with her and her boyfriend, Keith Burr, and Keith's sister, Dontrea. (Id. at 84-85). Johnson testified that Tamiko came over because Lloyd had been calling her that night, and that Tamiko was acting nervous. (Id. at 85-86). About an hour and a half later, Turks and John Manley came to the house, but Tamiko was not pleased to see Turks, according to Johnson. (Id. at 86). Johnson testified that Tamiko did not talk to Turks in the house; but instead, the two went out on the back porch to talk alone. (Id. at 87). Johnson testified that she was `sort of surprised that Tamiko's mom let her talk to Turks alone "cause [she] wouldn't have let [her] child go out knowing that [her] *Page 16 
child was scared." (Id. at 87-88). Johnson also testified that Tamiko told her that she was tired and was ready to break up with Turks and move on with her life. (Id. at 88).
 {¶ 24} Johnson testified that about five minutes after Tamiko and Turks went onto the back porch, she heard a scream. (Id. at 88). Johnson further testified that immediately after they ran out of the house and saw Tamiko lying on the ground with Turks beside her. (Id. at 89). Johnson testified that Tamiko was "hollering" Turks' name "Lloyd," and that no one else was with Tamiko when she was injured. (Id. at 89-90). According to Johnson, after the incident Turks stated, "[d]on't take her to the hospital. Take her home." (Id. at 90).
 {¶ 25} On cross-examination, Johnson testified that John and Tamiko were "tussling with each other — playing" when they were inside her house. (Id. at 92). She also testified that John led Tamiko out on the porch to talk with Turks. (Id. at 92-93). Johnson admitted that she did not witness Tamiko's injury and testified that she has not spoken with Tamiko since the incident. (Id. at 93-94).
 {¶ 26} Don Marik, a Lima Police Detective for the prior twenty-one years and officer for the prior thirty years, testified that he investigated the June 14-15, 2007 incident. (Id. at 95-96). Marik testified that, on June 25, 2007, he drove to the University of Toledo's Medical Center to speak with Tamiko, but that she could not speak at that time. (Id. at 97-98). Marik testified that he was nonetheless *Page 17 
able to communicate with Tamiko through head-gestures. (Id.). According to Marik, he determined that Tamiko was able to communicate accurately and coherently based on her responses to several test questions. (Id. at 98). Based upon his conversation with Tamiko, Marik testified that he concluded that: (1) the incident occurred on the ground, not the porch; (2) Turks grabbed Tamiko; and (3) Turks threw Tamiko to the ground. (Id. at 99-100). On cross-examination, Marik admitted that Tamiko was unable to actually speak to him, and that he was only able to determine how the incident happened after asking her a series of questions. (Id. at 100-01). Marik did not recall asking Tamiko if she tripped or if Tamiko was medicated at the time of questioning. (Id. at 101). However, Marik testified that he believed Tamiko was being truthful, and that she was alert enough to give accurate responses. (Id. at 102).
 {¶ 27} Steven James Stechschulte, Jr., a Lima Police Department Detective for the prior year and a half and officer for the prior fifteen years, testified that he too investigated the June 14-15, 2007 incident. (Id. at 103-04). Stechschulte testified that the case was transferred to him while Detective Marik was on leave. (Id. at 104). Stechschulte testified that, while at the Triumph section of St. Rita's Hospital, Tamiko told him "she was running from the house that Lloyd Turks had grabbed her from behind and placed his hand on the back of her neck and his other *Page 18 
hand on the small of her back and flipped her upside down and dropped her on her neck." (Id. at 104-05).
 {¶ 28} Stechschulte also testified that Reeder showed him the approximate location of Tamiko's body following her injury. (Id. at 105). Stechschulte testified that Detective Marik and he subsequently placed cones where Reeder indicated Tamiko's body was found. (Id. at 106). Stechschulte testified that he took pictures of the residence, along with the placed cones, and the measurements from the cones to the back porch. (Id.); (State's Exs. 4-8). Stechschulte testified that State's exhibit four was a picture of himself standing on the porch in order to demonstrate the relationship between Tamiko (who was about 2" shorter than he) and the height of the porch railing. (Id. at 106-07); (State's Ex. 4). Stechschulte testified that the measurement from the porch to where Tamiko's feet would have been after the injury was approximately thirteen and a half feet. (Id. at 109); (State's Exs. 5, 6, 8). Stechschulte further testified that the measurement from the porch to where Tamiko's head would have been after the injury was approximately fourteen and a half feet. (Id. at 108); (State's Exs. 5-7). Based on his measurements and the location of Tamiko's body, Stechschulte testified that he concluded that Tamiko could not have fallen off the porch, and that she was on the ground when she was injured. (Id. at 109). Stechschulte explained:
 Q: In other words, and correct me if I'm wrong, but are you saying that she could not have fallen off the porch? *Page 19 
 A: That's correct.
 Q: Why it that?
 A: Because of gravity and distance.
 Q: Go ahead and explain that, I mean, to the jury. If she would have fallen off of the porch where would she have landed?
 A: With the railing as high as it is and with her being approximately five foot six inches tall, well, it's above her waist line. If she would have been on the floor section of the porch and struck the porch railing, well, even if she would have had a great enough amount of force to flip her over that railing it would have caused her to land inverted, with her feet further north, and she would have been approximately a foot or foot and a half off of the porch at most.
 Q: Not thirteen to fourteen feet?
 A: Correct.
(Id. at 109-10).
 {¶ 29} At this point, the State rested it case, and Turks made a Crim. R. 29 motion for acquittal, which the trial court denied. (Id. at 114). The defense did not present any evidence and rested its case. (Id. at 116, 118). The matter was, thereafter, submitted to the jury, which returned a guilty verdict in a little over one hour. (Id. at 144, 147).
 {¶ 30} With this evidence and our standard of review set forth, we now proceed to our analysis as it pertains to defendant's conviction for felonious assault. The criminal act of felonious assault is codified in R.C. 2903.11, which provides, in pertinent part, "[n]o person shall * * * [c]ause serious physical harm to another * * *." R.C. 2903.11(A)(1). Turks does not argue that the State failed to establish that Tamiko suffered "serious physical harm"; but rather, that the State *Page 20 
failed to show that he caused her serious physical harm. Specifically, Turks argues that his conviction for felonious assault is against the manifest weight of the evidence, because the State failed to offer medical or eyewitness evidence to show that he caused the injury, and that the State's case rested on hearsay statements. We disagree.
 {¶ 31} Although it is true that the State failed to produce medical evidence or an eyewitness to prove that Turks caused Tamiko's injury, the jury had circumstantial evidence from which it could have reasonably reached that conclusion. As this Court has previously recognized, "proof of guilt may be made by circumstantial evidence, real evidence, and direct or testimonial evidence, or any combination of the three, and all three have equal probative value." State v. Davis, 3d Dist. No. 9-06-56,2007-Ohio-4741, ¶ 38 (Rogers, P.J.), citing State v. Hinson, 8th Dist. No. 87132, 2006-Ohio-3831, ¶ 61. See, also, State v. Kesler, 3d Dist. No. 13-06-09, 2006-Ohio-6340, ¶ 40 (Rogers, P.J.) ("Direct and positive proof that a crime was committed is not required; circumstantial evidence may be relied upon."). The jury sub judice had several facts and circumstances from which it could have reasonably concluded that Turks caused Tamiko's injury. To begin with, the jury heard evidence of Turks' possible motive. Reeder testified that, at the time of the incident, Tamiko and Turks were not together and living separately. (April 29-30, 2007 Tr. at 26). Reeder testified that Tamiko was fed-up, *Page 21 
done, and decided to end the marriage. (Id. at 27). Tamiko, herself, confirmed that at the time of the incident Turks and her were not together as a couple. (Id. at 57). Johnson testified that Tamiko had been coming over to her house frequently four to five days before the incident because she was scared of Turks. (Id. at 79). Johnson explained, "* * * I guess because they was breaking up, or whatever, and she was just scared that he would do something about them breaking up." (Id.).
 {¶ 32} In addition to motive, the jury heard evidence that: Turks had physically abused Tamiko (Id. at 26, 35, 39, 57, 75, 80); Turks had stalked Tamiko (Id. at 28); Turks was calling her insistently on the night of the incident (Id. at 29, 85); Turks was outside Stormy's bar, where Tamiko and her mom were having a drink, when he placed his last phone call to Tamiko (Id.); Turks was the only person with Tamiko when she was injured (Id. at 34, 44, 59, 87, 93); Turks was squatting next to Tamiko yanking on her left arm and saying, "[g]et up Mickie. Get up, Mickie." (Id. at 34, 47-48); Tamiko was calling out Turks' name while she was lying on the ground (Id. at 94); and that Turks suggested that they take Tamiko home and not to a hospital after she was seriously injured. (Id. at 90).
 {¶ 33} Furthermore, the jury also heard evidence from which they could have reasonably concluded that Turks' lied to the police and to Tamiko about how Tamiko was injured. Turks told Detective Niedemire that Tamiko: was wrestling with Cousin John outside, had an asthma attack, walked up onto the back porch *Page 22 
and sat on the porch railing, and then fell off the railing by accident. (Id. at 74). However, Detective Stechschulte testified that he concluded that Tamiko was not on the porch at the time of the injury because: Tamiko's body was found thirteen to fourteen feet from the back porch; the direction Tamiko's body was positioned post injury; and the height of the porch railing. (Id. at 109). Aside from Detective Stechschulte's testimony, the jury had several photographic exhibits that depicted the large distance between Tamiko's body and the back porch. (State's Exs. 4-8). The jury could have also concluded that Turks' story was fabricated because Reeder and Johnson testified that: Cousin John and Tamiko were wrestling or "playing" inside the residence; Cousin John did not go outside with Tamiko; and that only Turks was present with Tamiko when she was injured. (April 29-30, 2007 Tr. at 32, 34, 42-44, 59, 87, 92-93).
 {¶ 34} The jury also heard evidence that Turks told Tamiko two different versions of what happened the night she was injured. Turks initially told Tamiko that Cousin John pushed her; afterwards, Turks told Tamiko that she "fell or tripped over the porch." (Id. at 68). Neither of these explanations, however, is consistent with the testimony and photographic evidence, as explained above. Furthermore, the fact that Turks had two different stories, in and of itself, suggests fabrication. Aside from this, Tamiko testified that she did not believe either of *Page 23 
Turks' two stories, and admitted that she called Turks from the hospital to ask him `why did you do this to me.' (Id. at 69-70).
 {¶ 35} The jury also heard evidence from Tamiko from which they could rationally infer that Turks caused the injury. Tamiko testified that she remembered: going to Stormy's bar with her mother, Reeder; (Id. at 58); Turks calling and bothering her while she was at the bar (Id.); that it was just her and Turks on the back porch (Id. at 59); that she was running from Turks (Id. at 59-60); and that, when she was running from Turks, she was afraid of him. (Id.). Tamiko also remembered probably telling her mom that Turks chased her from the porch, picked her up, and threw her down. (Id. at 65). Tamiko remembered running from Turks on the ground. (Id. at 66). Tamiko also testified that she has never passed out from an asthma attack, which undermined defense counsel's theory of the case on cross-examination. (Id. at 68-69).
 {¶ 36} Although Tamiko's testimony is not conclusive of Turks' guilt, it is consistent with her prior statements and consistent with the totality of the evidence. Furthermore, the jury heard evidence that Tamiko has failed to follow through with domestic violence charges against Turks in the past. (Id. at 75). Consequently, a rational juror could have concluded that Turks caused the injury, and Tamiko, for whatever reason(s), changed her story at trial. On the other hand, the jury might have concluded that Tamiko genuinely could not remember at trial. *Page 24 
In either event, the jury, as trier of fact, could accept or reject all or part of Tamiko's testimony.
 {¶ 37} In addition to the circumstantial evidence above, for purposes of review under manifest weight, we must also consider Tamiko's prior statements that Turks' grabbed her and threw her to the ground causing her injury. These statements were admitted without objection; and therefore, evidence from which the jury could have determined Turks' guilt. Several things about these statements make them more reliable than they might otherwise be. First, Tamiko informed several individuals that Turks was responsible for her injuries, including: Reeder, Detective Marik, and Detective Stechschulte. (Id. at 38, 50, 99, 104-05). Second, Tamiko's version of events told to each individual was consistent: she was running and Turks grabbed her and threw her to the ground. (Id.). Third, Tamiko told Detective Marik that Turks caused her injury within ten days (June 25, 2007) of the injury, when her recollection was fresh. (Id. at 97-98). Fourth, Tamiko told Detective Stechschulte that Turks caused her injury when she was at St. Rita's Triumph section, which, according to the testimony, was about three months after her injury. (Id. at 37, 104). This indicates that Tamiko's story was not only consistent as between each individual but consistent over time, which, in turn, indicates credibility. *Page 25 
 {¶ 38} On the basis of all this evidence, we cannot say that `"the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Thompkins, 78 Ohio St.3d at 387, quotingMartin, 20 Ohio App.3d at 175. Therefore, Turks' conviction is not against the manifest weight of the evidence.
 {¶ 39} Turks' second assignment of error is overruled.
 ASSIGNMENT OF ERROR NO. I THE DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL DUE TO THE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.
 {¶ 40} In his first assignment of error, Turks argues that he was denied effective assistance of counsel. In support of this argument, Turks points out that: trial counsel failed to lodge a single objection during the course of the entire trial; trial counsel failed to object to hearsay testimony of Tamiko's prior statements; and that trial counsel's closing argument was insufficient because counsel failed to point out the lack of medical evidence, the inconsistencies in testimony, the trustworthiness of hearsay, or credibility issues. The State, on the other hand, argues that a failure to make objections and the sufficiency of closing argument are not grounds for ineffective assistance of counsel. The State also argues that defense counsel's failure to object might well have been a trial strategy. We agree with the State that Turks has failed to establish ineffective assistance of counsel. *Page 26 
 {¶ 41} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. State v. Kole (2001), 92 Ohio St.3d 303, 306,750 N.E.2d 148, citing Strickland v. Washington (1984), 466 U.S. 668,687, 104 S.Ct. 2052, 80 L.Ed.2d 674. In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. Strickland, 466 U.S. at 687. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. State v. Sallie (1998),81 Ohio St.3d 673, 675, 693 N.E.2d 267. Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. State v. Carter (1995), 72 Ohio St.3d 545, 558,651 N.E.2d 965. Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. State v.Bradley (1989), 42 Ohio St. 3d 136, 141-42, 538 N.E.2d 373, quotingState v. Lytle (1976), 48 Ohio St.2d 391, 396, 358 N.E.2d 623. Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Bradley, 42 Ohio St.3d at 142, citing Strickland,466 U.S. at 691. "A reasonable probability is a probability sufficient to *Page 27 
undermine confidence in the outcome." Bradley, 42 Ohio St.3d at 142;Strickland, 466 U.S. at 694.
 {¶ 42} Turks has failed to establish ineffective assistance of trial counsel. To begin with, the manner and content of trial counsel's closing arguments are a matter of trial strategy and do not constitute ineffective assistance of counsel. State v. Williams, 3d Dist. No. 9-07-61, 2008-Ohio-3887, ¶ 70, citing State v. Smith, 9th Dist. No. 23542, 2007-Ohio-5119, ¶ 18; State v. Poole, 8th Dist. No. 80150, 2002-Ohio-5065, ¶ 22; Carter, 72 Ohio St.3d at 558. The record demonstrates that trial counsel's main strategy was to establish reasonable doubt by highlighting, through cross-examination, that: (1) the State failed to produce eyewitnesses; (2) the victim could not recall whether the defendant caused her injury; and (3) the victim's previous statements that defendant caused her injuries were mistaken. This strategy is consistent with both counsel's opening and closing statements. (April 29-30, 2007 Tr. at 24, 126). Although this strategy was ultimately unsuccessful, it was strategy; and therefore, not ineffective assistance. Carter, 72 Ohio St.3d at 558.
 {¶ 43} Additionally, trial counsel's failure to make objections, alone, does not establish ineffective assistance of counsel. State v.Conway (2006), 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 103. Furthermore, trial counsel's failure to object is generally viewed as trial strategy and does not establish *Page 28 
ineffective assistance. State v. McKinney, 11th Dist. No. 2007-T-0004,2008-Ohio-3256, ¶ 191, citing State v. Hunt (1984), 20 Ohio App.3d 310,311, 486 N.E.2d 108; State v. Gumm (1995), 73 Ohio St.3d 413, 428,653 N.E.2d 253. The record here reveals that Tamiko called defense counsel Thursday, Friday, and Monday before trial and informed counsel that she could not remember what happened the night of the incident. (April 29-30, 2007 Tr. at 66). Furthermore, Tamiko specifically informed defense counsel before trial that she probably told her mother that Turks chased her off the porch, picked her up, and threw her down, but that she was not sure that was true when she made the statement. (Id. at 65). Accordingly, trial counsel's failure to object to the admission of Tamiko's hearsay statements could have been a matter of trial strategy, because trial counsel was aware before trial that Tamiko would testify and explain these statements away. Since it was a matter of trial strategy, counsel's decision not to object to the hearsay statements cannot establish ineffective assistance. Carter, 72 Ohio St.3d at 558.
 {¶ 44} Turks has also failed to establish prejudice. We are not persuaded that, but for counsel's alleged errors, the outcome of the trial would have been different. Bradley, 42 Ohio St.3d at 142, citingStrickland, 466 U.S. at 691. In light of all the circumstantial evidence of guilt catalogued in our manifest weight analysis above, our confidence in the outcome has not been undermined by Turks' *Page 29 
allegations of ineffective assistance. Bradley, 42 Ohio St.3d at 142;Strickland, 466 U.S. at 694. We are not persuaded that, but for the hearsay statements being admitted, defendant would not have been found guilty. Nor are we persuaded that defendant would not have been found guilty if trial counsel's closing argument was better, as Turks suggests.
 {¶ 45} Turks' first assignment of error is, therefore, overruled.
 {¶ 46} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment Affirmed
 WILLAMOWSKI and ROGERS, J.J., concur. *Page 1